881 So.2d 1087 (2004)
John CHAMBERLAIN, Appellant,
v.
STATE of Florida, Appellee.
No. SC02-1150.
Supreme Court of Florida.
June 17, 2004.
Rehearing Denied September 1, 2004.
*1092 Gregg S. Lerman, West Palm Beach, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Debra Rescigno, Assistant Attorney General, West Palm Beach, FL, for Appellee.
PER CURIAM.
Chamberlain appeals his convictions and sentences of death after a jury found him guilty of three counts of first-degree murder and one count of armed robbery for participating in a 1998 West Palm Beach triple homicide.[1]

FACTS
Four persons  Chamberlain, Thomas Thibault, Jason Dascott, and Amanda Ingman  took part in this triple homicide. Thibault, the admitted triggerman, pled guilty to first-degree murder and was sentenced to death. Dascott pled guilty to second-degree murder. Ingman was not charged. Thibault, Dascott, and Ingman all testified against Chamberlain at trial. The relevant facts are as follows.
Sometime in October or November of 1998, Ingman began trying to locate Thibault, her drug supplier and "occasional pimp," to purchase some cocaine. After hearing that Ingman was looking for him, Thibault telephoned Ingman at a house on Norton Avenue in West Palm Beach, where she lived with the victims in this case  Bryan Harrison, Charlotte Kenyan, and Daniel Ketchum. Harrison, who was Ingman's boyfriend, became angry at Thibault for calling Ingman. In the early morning hours of November 26, 1998, which was Thanksgiving Day, Thibault enlisted Dascott and Chamberlain to go with him to the Norton Avenue house to deliver some cocaine to Ingman and to attempt to resolve the argument with Harrison. Thibault told Chamberlain that there might be a confrontation. Although Chamberlain did not personally know anyone at the Norton Avenue house, Thibault testified that Chamberlain responded that he "had [Thibault's] back and he was down to go." Chamberlain drove Thibault and Dascott in a car belonging to Chamberlain's father. A .45 caliber handgun and ammunition belonging to Chamberlain's father were in the trunk of the car. En route, the men stopped at a gas station, where Chamberlain showed Thibault the gun.
*1093 The argument between Thibault and Harrison was resolved quickly after Thibault, Chamberlain, and Dascott arrived at the Norton Avenue house. Chamberlain, Thibault, Dascott, Ingman, and Harrison then snorted cocaine together in Ingman's bedroom. At some point, Ketchum, another resident of the Norton Avenue house, entered the room and mentioned to Thibault that he had some electronic equipment to sell for cocaine. Harrison and Ingman also said they wanted more cocaine. Thereafter, Chamberlain, Thibault, Dascott, Ingman, and Harrison drove to the house of a drug dealer for more cocaine and to offer to sell Ketchum's electronic equipment. Thibault went inside alone and obtained more cocaine. Thibault testified that the supplier was not interested in buying the electronic equipment, and at that point Thibault began thinking about just "taking" the equipment.
Upon returning to the Norton Avenue house, Harrison and Ingman went inside while Thibault, Chamberlain, and Dascott remained outside and discussed robbing the residents of the house. The three then went inside. At some point, while in Ingman's bedroom, Thibault, Chamberlain, Dascott, and Ingman devised a robbery plan in which either Ingman or Dascott would persuade Ketchum to open a safe that was located in the living room. Thibault testified that Chamberlain then suggested that Thibault use the gun to announce the robbery and put Harrison and Ketchum in the bathroom because Thibault was physically the largest. Ingman, Dascott, and Chamberlain would then loot the house.
Either Ingman or Dascott persuaded Ketchum to open the safe. Thibault then ordered Ketchum and Harrison into the bathroom. Chamberlain helped move Ketchum and Harrison into the bathroom by striking Ketchum on the leg[2] with a baton-like weapon, later identified as an asp.[3] While Thibault held Ketchum and Harrison at gunpoint in the bathroom, Ingman, Dascott, and Chamberlain began removing electronic items such as televisions and radios from the house and putting the items in Chamberlain's car. Meanwhile in the bathroom, Ketchum rushed Thibault. Thibault shot and killed Ketchum during the ensuing struggle.
Thibault left the bathroom and told the others that he had killed Ketchum. Thibault and Ingman testified that Chamberlain then said "no more witnesses," and encouraged Thibault to kill Harrison or else they were "all going to die," and were "all going to the electric chair." Thibault also testified that he left the decision up to Ingman, who said to "go ahead and get rid of the other witnesses." Ingman and Thibault then awakened Charlotte Kenyan, who had been sleeping in a back bedroom, and placed her in the bathroom with Harrison. Thibault testified that he "emptied the gun" into Harrison and Kenyan while Chamberlain stood by his side. Chamberlain then picked up the shell casings because they had his fingerprints on them. Chamberlain and Thibault noticed that Harrison was not dead, so Chamberlain went to the car, retrieved more bullets, and reloaded the gun. Thibault again "emptied the gun" into Harrison and Kenyan.
After the killings, Chamberlain drove Ingman and Dascott to Chamberlain's parents' *1094 house. The three unloaded the car, and went into the house. Subsequently, Thibault arrived at Chamberlain's house in a taxi. Chamberlain, Thibault, and Dascott then took the stolen items to the house of Donna Garrett. Shortly thereafter, Chamberlain and Dascott separated from Thibault.
Ingman testified that she sneaked out of a window of Chamberlain's house, went to the house of Harrison's father, and told him of the murders. She returned with Harrison's father to the Norton Avenue house, where they called the police. Alerted to Chamberlain's involvement by Ingman, the police searched Chamberlain's house in the early evening of November 26 pursuant to a search warrant. Chamberlain was not present at that time. He later surrendered to the police on Sunday, November 29, 1998.
At trial, the theory of the State's case was that Chamberlain was instrumental in instigating the murders. The State specifically relied on Chamberlain's use of the asp to push the victims into the bathroom and his statement, "no more witnesses," to support its theory of Chamberlain's involvement. Chamberlain's defense was that the other participants conspired to place the blame on Chamberlain, and their motive to blame Chamberlain increased when the State offered them plea agreements. The jury found Chamberlain guilty of three counts of first-degree murder.
Chamberlain waived a penalty phase jury prior to trial. The penalty phase hearing was therefore held in front of the trial judge. In the sentencing order, the trial judge found six aggravating factors: (1) the murder was committed while Chamberlain was under the supervision of the Department of Corrections; (2) Chamberlain had prior violent felony convictions (the contemporaneous murders and robbery); (3) the murders were committed while Chamberlain was engaged in a robbery; (4) the murders were committed to avoid arrest; (5) the murders were committed for pecuniary gain; and (6) the murders were cold, calculated, and premeditated (CCP). The trial judge found in mitigation that Chamberlain had the ability to form loving relationships and other factors in the defendant's past, including the fact that Chamberlain had some parental neglect and he was teased by older cousins who lived with Chamberlain's family for a while.[4] The trial court gave the mitigators slight weight. Determining that the aggravators outweighed the mitigators, the trial judge sentenced Chamberlain to death for each murder.
In this appeal, Chamberlain raises eleven issues for review: (1) death qualification of the jury; (2) denial of Chamberlain's motion to disqualify the trial judge; (3) comments on Chamberlain's credibility; (4) an out-of-court identification of Chamberlain; (5) an alleged violation of the rule of sequestration; (6) use of prior consistent statements; (7) use of a demonstrative aid; (8) constitutionality of the felony-murder jury instruction; (9) sufficiency of the evidence of first-degree murder; (10) constitutionality of the murder in the course of a felony aggravator; and (11) sufficiency of the evidence supporting the finding of aggravating factors and the rejection of mitigating factors. We address *1095 each of these issues, and also address whether the death penalty is proportional in this case.

GUILT PHASE

Death Qualified Jury Voir Dire
The first issue arises from Chamberlain's waiver of the penalty-phase jury. Unlike Thibault v. State, 850 So.2d 485 (Fla.2003), in which we reversed the death sentence of Chamberlain's codefendant because of the absence of an affirmative waiver of a penalty-phase jury, see id. at 487, Chamberlain does not contest the validity of the waiver itself. Rather, Chamberlain argues that because he waived his right to a penalty-phase jury before the guilt phase of the trial, the trial court abused its discretion in allowing the State to question the potential jurors regarding their feelings on the death penalty.
During jury selection, the jurors were informed over defense objection that although the judge alone would decide on the sentence, death was an option. The questioning permitted by the trial court was more limited than if the voir dire had been conducted to death qualify the jury to participate in both the guilt and penalty phases. The trial court then granted nine challenges for cause against jurors who stated that they would have difficulty finding a defendant guilty of first-degree murder if their verdict might lead to the death penalty.[5]
This Court has repeatedly held that "[t]he scope of voir dire questioning rests in the sound discretion of the court and will not be interfered with unless that discretion is clearly abused." Darling v. State, 808 So.2d 145, 160 (Fla.2002) (quoting Franqui v. State, 699 So.2d 1312, 1322 (Fla.1997), cert. denied, 537 U.S. 848, 123 S.Ct. 190, 154 L.Ed.2d 78 (2002)). In Darling, a capital case, this Court held that the trial court did not abuse its discretion in precluding questioning of jurors concerning the death penalty. The trial court did not allow the defense to ask potential jurors whether they had seen stories of prisoners released from death row, and whether their "drive" to impose death would be lessened by the availability of an alternative of life without parole. However, the court permitted defense counsel to explore jurors' concerns over the length of capital proceedings and their understanding of alternative penalties that applied. This Court found no error. See 808 So.2d at 160.
On the other hand, in Lavado v. State, 492 So.2d 1322, 1323 (Fla.1986), this Court held that the trial court abused its discretion by precluding defense counsel from questioning potential jurors about their willingness to accept the defense of voluntary intoxication. The Court adopted the dissenting opinion below, in which Judge Pearson stated that "where a juror's attitude about a particular legal doctrine (in the words of the trial court, `the law') is essential to a determination of whether challenges for cause or peremptory challenges are to be made, it is well settled that the scope of the voir dire properly includes questions about and references to that legal doctrine." Lavado v. State, 469 So.2d 917, 919-20 (Fla. 3d DCA 1985) (Pearson, J., dissenting).
Florida Rule of Criminal Procedure 3.390(a) provides in pertinent part that "[e]xcept in capital cases, the judge shall not instruct the jury on the sentence that may be imposed for the offense for which *1096 the accused is on trial." (Emphasis supplied.) The United States Supreme Court has held that in capital cases, if a juror's views of the death penalty will prevent or substantially impair the performance of the juror's duties at the sentencing phase, the juror may be excused for cause. See Lockhart v. McCree, 476 U.S. 162, 173, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); Wainwright v. Witt, 469 U.S. 412, 433, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). This Court has similarly recognized that there is no constitutional infirmity in the "death qualification" of a jury in a capital case. See San Martin v. State, 705 So.2d 1337, 1343 (Fla.1997). Thus, the question is whether, in a first-degree murder case in which the State is seeking the death penalty and the defendant has waived a penalty-phase jury, the jury should be told that a conviction may result in imposition of the death penalty.
On this issue as on many others, death is different. The transcript of voir dire in this case illustrates that at least some potential jurors were aware before voir dire that death was a potential penalty for first-degree murder.[6] For example, when defense counsel asked potential juror Williams whether she could serve in a criminal case if she did not know the potential penalties, she stated she would know the death penalty was possible once she was told it was a first-degree murder case. Juror Williams' response demonstrates that some persons called for jury duty are generally aware that their decision in a first-degree murder case may result in a sentence of death. In contrast to the available penalties of either life imprisonment or death for first-degree murder, the array of sentencing laws for noncapital crimes in Florida Statutes, including several different recidivist schemes, makes general awareness of the potential penalty for another particular crime far less likely.
In recognition of the fact that at least some potential jurors know that a verdict of guilty in a first-degree murder case may lead to the defendant's execution, we decline to impose a per se rule preventing any questioning of jurors on the death penalty when death remains a potential sentence. To conclude otherwise would create an unacceptable risk that jurors who cannot fulfill their oaths will serve in the guilt phase of capital proceedings. An additional concern is that in this case, it is Chamberlain's position that he could have withdrawn his waiver after the return of the guilty verdict. Had this happened, the jurors would not have been death qualified and the trial court would have been placed in a position of either refusing to allow Chamberlain to withdraw his waiver or having to impanel a different death-qualified jury to hear the penalty phase. Nevertheless, we urge the cautious exercise of judicial discretion in allowing questioning on this sensitive subject in cases in which jurors will not actually render an advisory sentence.
Under the circumstances of this case, the trial court struck a proper balance between the rights of the accused and the *1097 State. In light of the limited nature of the questioning, we conclude that the trial court did not abuse its discretion in permitting the voir dire concerning the death penalty. Chamberlain is not entitled to reversal on this issue.

Motion to Disqualify Trial Judge
The next issue involves the denial by Judge Mounts, the trial judge, of a request that he disqualify himself from Chamberlain's sentencing. Although Thibault pled guilty before Chamberlain's trial, Judge Mounts deferred sentencing of Thibault until after he testified at Chamberlain's trial. Thibault was sentenced before Chamberlain. After the trial court entered its order sentencing Thibault to death, Chamberlain filed a motion to disqualify Judge Mounts pursuant to section 38.10, Florida Statutes (2001). Chamberlain alleged that, based on factual findings in Thibault's sentencing order concerning Chamberlain's level of culpability, Chamberlain had a "well grounded fear that he [would] not receive a fair sentencing hearing at the hands of the judge." Judge Mounts denied Chamberlain's motion to disqualify. It is Chamberlain's position on appeal that this denial created reversible error. We disagree.
The test a trial court must use in determining "whether a motion to disqualify is legally sufficient is `whether the facts alleged would place a reasonably prudent person in fear of not receiving a fair and impartial trial.'" Barnhill v. State, 834 So.2d 836, 843 (Fla.2002) (quoting MacKenzie v. Super Kids Bargain Store, Inc., 565 So.2d 1332, 1335 (Fla.1990)), cert. denied, 539 U.S. 917, 123 S.Ct. 2281, 156 L.Ed.2d 134 (2003). The motion to disqualify "must be well-founded and contain facts germane to the judge's undue bias, prejudice, or sympathy." Wright v. State, 857 So.2d 861, 873 (Fla.2003) (quoting Jackson v. State, 599 So.2d 103, 107 (Fla.1992)), cert. denied, ___ U.S. ___, 124 S.Ct. 1715, 158 L.Ed.2d 402 (2004). Whether the motion is "legally sufficient" is a question of law, and the proper standard of review is de novo. See Barnhill, 834 So.2d at 843.
In this case, Chamberlain alleged that the statements Judge Mounts made in Thibault's sentencing order concerning Chamberlain's culpability caused Chamberlain to fear that he could not receive a fair and impartial sentencing by Judge Mounts. However, "[t]he fact that the judge has made adverse rulings in the past against the defendant, or that the judge has previously heard the evidence, or `allegations that the trial judge had formed a fixed opinion of the defendant's guilt, even where it is alleged that the judge discussed his opinion with others,' are generally considered legally insufficient reasons to warrant the judge's disqualification." Rivera v. State, 717 So.2d 477, 481 (Fla.1998) (quoting Jackson, 599 So.2d at 107).
We conclude that the findings made by Judge Mounts in sentencing Thibault were necessary to support Thibault's death sentence and did not indicate a fixed intention to sentence Chamberlain to death. Relative culpability is one of the factors the court must evaluate in deciding whether to impose the death penalty in any case involving multiple perpetrators. See Evans v. State, 808 So.2d 92, 108 (Fla.2001) (recognizing that a death sentence may be disproportionate if an equally culpable codefendant is sentenced to life imprisonment). In this case, all the trial court's findings in Thibault's sentencing order concerning Chamberlain were supported by Thibault's statement in anticipation of his guilty plea. The same facts were also elicited from Thibault when he testified at Chamberlain's trial, which took place seven months before Thibault was *1098 sentenced. Judge Mounts' conclusions in Thibault's sentencing order as to Chamberlain's participation in the murders were consistent with Thibault's statement and the facts heard by Judge Mounts during Chamberlain's trial.
Thus, because the statements by Judge Mounts relied on by Chamberlain in his motion to disqualify were neither germane to nor indicative of any bias or prejudice, Judge Mounts did not err in denying the motion to recuse. Chamberlain is not entitled to reversal on this issue.

Credibility Comments
The next issue concerns comments made by one of the detectives in this case regarding Chamberlain's credibility. During the direct examination of Detective Fraser, the State played a tape of Chamberlain's police interview in which Chamberlain could be heard crying. Asked by the State for his opinion on Chamberlain's crying, Detective Fraser indicated that he did not think it was genuine. Chamberlain objected and moved for a mistrial. The trial court denied the motion for mistrial, but sustained the objection and instructed the jury to disregard "the conclusion of the officer as to his observation." Chamberlain argues that the instruction to disregard was insufficient to ameliorate the prejudice caused by the improper opinion testimony.
A ruling on a motion for a mistrial is within the sound discretion of the trial court and should be granted only when necessary to ensure that the defendant receives a fair trial. See Rivera v. State, 859 So.2d 495, 512 (Fla.2003). "The use of a harmless error analysis under State v. DiGuilio, 491 So.2d 1129 (Fla.1986), is not necessary where the trial court recognized the error, sustained the objection and gave a curative instruction. Instead, the correct appellate standard of review is abuse of discretion." Id. (quoting Smithers v. State, 826 So.2d 916, 930 (Fla.2002)) (internal quotation marks and citation omitted).
Although "there [is no] legal principle more firmly established in our system of jurisprudence than that which makes the jury the sole arbiter of the credibility of the witnesses," Barnes v. State, 93 So.2d 863, 864 (Fla.1957), we are not persuaded by Chamberlain's argument that the instruction to disregard was insufficient in this case. First, defense counsel cut off Detective Fraser's statement with an objection, so that the comments regarding Chamberlain's credibility heard by the jury were limited.[7] Second, the brief comments were not repeated by other witnesses or in closing argument. Under these circumstances, the trial court's actions of sustaining the objection and giving the instruction to disregard were sufficient. No abuse of discretion has been demonstrated and therefore Chamberlain is not entitled to relief.

Out of Court Identification
This issue concerns an out-of-court photographic lineup identification of Chamberlain made by State witness Donna Garrett. At trial, Garrett testified that on Thanksgiving morning, November 26, 1998, three men came to her house carrying electronic equipment. Without objection, the State introduced into evidence a photopack from which, two years after the incident, Garrett had identified with eighty percent certainty a picture of Chamberlain as depicting one of the men at her house on Thanksgiving morning. However, when asked at trial to identify which picture *1099 she had previously selected, Garrett misidentified the picture of Chamberlain.
Chamberlain alleges that the photopack identification was unreliable and unduly prejudicial and should not have been admitted because Garrett was only eighty percent certain of her identification of Chamberlain. This Court has set forth a two-pronged test to determine whether suppression of an out-of-court identification is warranted: "(1) did the police use an unnecessarily suggestive procedure to obtain the out-of-court identification; (2) and if so, considering all the circumstances, did the suggestive procedure give rise to a substantial likelihood of irreparable misidentification." Dennis v. State, 817 So.2d 741, 760 (Fla.2002) (quoting Thomas v. State, 748 So.2d 970, 981 (Fla.1999)). Not only was this issue not preserved for appeal but, other than generally asserting that the photopack was prejudicial, Chamberlain fails to advance any argument regarding the two-pronged test or address the factors to be considered when determining whether suppression of an out-of-court identification is warranted. We conclude that Chamberlain is not entitled to reversal on this issue both because it was not preserved and because the argument on appeal is insufficiently pled.
Also regarding Garrett's identification, Chamberlain alleges that the trial court erred in subsequently allowing Detective Fraser to testify as to the identification Garrett made of Chamberlain when she observed the photopack. Chamberlain argues that Detective Fraser's testimony was inadmissible hearsay. We do not reach the issue of whether it was error to allow Fraser to testify to the identification because we conclude that if error occurred, it was harmless beyond a reasonable doubt for several reasons.
First, the identification did not involve Chamberlain's actions or involvement in the murder. Rather, the identification related to Chamberlain's whereabouts the morning after the murder. Second, Garrett was only one of four witnesses who identified Chamberlain as being at her house the morning of November 26, 1998. Garrett's mother, her brother, and her boyfriend all identified Chamberlain with 100 percent certainty as one of the men at Garrett's house that morning. These witnesses all testified at trial and confirmed their previous identifications. Thus, Chamberlain's presence at Garrett's house on the morning of the killings was collateral to Chamberlain's culpability, several witnesses other than Garrett identified him as being present, and Garrett herself testified to, and was cross-examined on, her identification. Chamberlain is not entitled to reversal on this issue.

Rule of Sequestration
In this issue, Chamberlain argues that the State violated the rule of sequestration by speaking with Detective Fraser during a break in his testimony. Detective Fraser testified after defense counsel invoked the rule of sequestration. At the conclusion of his testimony, the court excused the jury, but asked Detective Fraser to remain in the courtroom during a bench conference. Thereafter, the prosecutor briefly discussed with Detective Fraser that he was going to be recalled to testify about a July 26, 1999, bond hearing in which Chamberlain was a witness. Defense counsel objected to Fraser being recalled on the grounds that the State had violated the rule by discussing with Fraser his potential testimony on recall during a break in the proceedings and while the he was still under oath. The court overruled the objection. Chamberlain argues that this ruling was reversible error. We disagree.
*1100 The rule of sequestration provides:
At the request of a party the court shall order, or upon its own motion the court may order, witnesses excluded from a proceeding so that they cannot hear the testimony of other witnesses....
§ 90.616(1), Fla. Stat. (2003). The rule is designed to aid in ensuring a fair trial "by avoiding `the coloring of a witness's testimony by that which he has heard from other witnesses who have preceded him on the stand,'" Gore v. State, 599 So.2d 978, 986 (Fla.1992) (quoting Spencer v. State, 133 So.2d 729, 731 (Fla.1961)), thereby discouraging "fabrication, inaccuracy and collusion." Knight v. State, 746 So.2d 423, 430 (Fla.1998) (quoting Charles W. Ehrhardt, Florida Evidence § 616.1, at 506 (1998 ed.)).
In this case, there is no indication or allegation that Detective Fraser remained in the courtroom during the testimony of another witness, or that Detective Fraser discussed his testimony with another witness. Cf. Lott v. State, 695 So.2d 1239, 1243 (Fla.1997) (violation of rule for three state crime-scene witnesses, two of whom had yet to testify, to discuss certain aspects of a murder investigation while they were in witness room during presentation of State's case). Chamberlain has not demonstrated error and therefore is not entitled to relief on this issue.

Prior Consistent Statements
This issue concerns the State's attempt to rehabilitate Thibault through prior consistent statements after he was cross-examined. At trial, the State recalled and questioned Thibault about a taped telephone conversation that he had with his mother while he was at the police station on November 30, 1998, four days after the murders. Thibault's statements during the phone conversation corroborated his testimony at trial. Chamberlain argues that the trial court committed reversible error in allowing the State to recall Thibault to testify about the conversation because the statements did not fall within the hearsay exception for prior consistent statements. We conclude that Chamberlain is not entitled to reversal on this issue.
First, this issue is not preserved for appeal. At trial, Chamberlain objected to the tape being introduced at trial on grounds that it was hearsay on hearsay and cumulative.[8] Chamberlain's counsel never argued to the trial court that the tape did not fall within the evidentiary rule providing that prior consistent statements are not hearsay. It is well-settled in Florida that "[t]o be preserved for appeal, `the specific legal ground upon which a claim is based must be raised at trial and a claim different than that will not be heard on appeal.'" Spann v. State, 857 So.2d 845, 852 (Fla.2003) (quoting Rodriguez v. State, 609 So.2d 493, 499 (Fla.1992)).
Second, even if Chamberlain had properly preserved this issue, it has no merit. One of the defense theories at trial was that Thibault had conspired to portray Chamberlain as the instigator in the murders either to secure a favorable plea and merciful sentence or out of loyalty to Dascott. During cross-examination, defense counsel elicited testimony from Thibault regarding his initial plea, his decision to reject the plea and request mercy from the court in exchange for testifying, and the letters he exchanged with Dascott in jail. The State's purpose in introducing Thibault's conversation with his mother, which *1101 was recorded four days after the murders and presumably before any motive to lie arose, was to rehabilitate Thibault through prior consistent statements.
Section 90.801, Florida Statutes (2003), which excludes some prior consistent statements from the definition of hearsay, provides in pertinent part:
(2) A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is:
....
(b) Consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of improper influence, motive, or recent fabrication....
Chamberlain does not challenge the State's assertion that Thibault's conversation with his mother was consistent with his trial testimony. Nor does he contest the fact that one of the defense strategies was to argue that Thibault was fabricating Chamberlain's role in the murders. Chamberlain's sole argument against the admissibility of the tape under section 90.801(2)(b) is that Thibault's motive to lie arose before the conversation with his mother. According to Chamberlain, Thibault and Dascott began conspiring late on Thanksgiving Day 1998, the day of the murders. Thus, Chamberlain argues that the tape was useless to rebut the charge of fabrication.
Regardless of the veracity of Chamberlain's timeline of when Thibault and Dascott allegedly began conspiring, it is clear from the record that the taped conversation occurred before plea negotiations or the State's requests for testimony. Thus, we are guided by this Court's decision in Chandler v. State, 702 So.2d 186 (Fla.1997). In that case, a witness testified that the defendant admitted the murder to her in November 1989. On cross-examination, defense counsel elicited two motives for the witness to lie, one arising in October 1990 and one arising in 1994. On redirect, the State rehabilitated the witness with a prior consistent statement given in October 1992, before the 1994 motive to lie arose. Despite the fact that the prior consistent statement was made after the first motive to lie advanced by defense counsel arose, this Court concluded that the statement was nonetheless properly admitted. See id. at 197-98. We stated that
[t]he October 1992 statement was undisputedly made after the October 1990 ... incident. However, by directly suggesting that the [1994 incident] motivated [the witness's] testimony, Chandler could not thereafter prevent the State from rehabilitating her testimony by urging that another motive to fabricate existed earlier. That was a choice that the defendant made in urging more than one reason to fabricate at trial. Having made this choice, he must suffer its natural consequences.
Id. at 198. Similarly, in this case, having advanced the plea negotiations and requests for testimony as a motive for Thibault to fabricate testimony, Chamberlain cannot thereafter prevent the State from rehabilitating Thibault with statements made before the negotiations and requests by urging that the alleged conspiracy with Dascott existed earlier. The trial court did not err in admitting the prior consistent statement and we therefore reject Chamberlain's claim of error on this issue.

Use of Demonstrative Aid
In this next issue, Chamberlain attacks the State's use of a demonstrative aid during Amanda Ingman's direct examination. At trial, Ingman testified that on the night of the murders she witnessed the defendant holding a weapon with a flat *1102 black handle. At the State's request and over defense objection, the trial court allowed a plainclothes police officer to display an asp to Ingman to aid her in describing the weapon she had seen to the jury. Ingman testified that the weapon she saw the defendant hold on the evening of the murders was smaller than the one displayed to her by the police officer.
The standard for allowing demonstrative evidence at trial was recently reiterated by this Court in Harris v. State, 843 So.2d 856, 863 (Fla.2003), wherein we stated:
Demonstrative evidence is admissible only when it is relevant to the issues in the case.... [I]t is essential, in every case where demonstrative evidence is offered, that the object or thing offered for the jury to see be first shown to be the object in issue and that it is in substantially the same condition as at the pertinent time, or that it is such a reasonably exact reproduction or replica of the object involved that when viewed by the jury it causes them to see substantially the same object as the original.
The person offering such evidence should be required to give a good reason for its acceptance into evidence, and this is particularly true if the object be not the original, but only a replica or a facsimile.
Id. (quoting Alston v. Shiver, 105 So.2d 785, 791 (Fla.1958)). "The determination as to whether to allow the use of a demonstrative exhibit is a matter within the trial court's discretion." Brown v. State, 550 So.2d 527, 528 (Fla. 1st DCA 1989); see also Heath v. State, 648 So.2d 660, 664 (Fla.1994) (stating that trial court has broad discretion to determine relevance of evidence).
We conclude that the trial court did not abuse its discretion in allowing the demonstration in this case. Chamberlain's possession of a weapon on the evening of the murders was relevant, as it tended to show his level of involvement in the crimes. Moreover, the demonstrative aid was not admitted into evidence, and the State did not claim that it was the same weapon used in the murders. The State claimed only that it was similar. See Wade v. State, 204 So.2d 235, 238-39 (Fla. 2d DCA 1967) (approving admission of object similar but not identical to object used in crime). Further, Ingman was subject to cross-examination on the extent to which the weapon resembled the object she had seen in Chamberlain's possession the night of the murders.
However, Chamberlain points out that later in the trial, the State actually introduced into evidence a seven-and-a-half-inch friction-lock baton, or asp, that was recovered three days after the murder. At a bench conference, defense counsel renewed his objection to the prior demonstration, arguing:
Apparently, it's going to be the State's position now that if Mr. Chamberlain had a baton or anything in his hand that Exhibit 154 is going to be the item that he had.
Based on that and that this exhibit has been placed into evidence and based on the demonstration that I objected to yesterday and the demonstration which was performed, which is an item substantially larger than this Exhibit 154, I renew my objection at this time and am moving for a mistrial.
....
It's substantially smaller in width, length, and weight than what was shown yesterday and looks substantially less ominous than what 
The trial court denied the motion for mistrial. Chamberlain argues on appeal that *1103 the trial court's ruling was erroneous because, by comparison with the smaller asp, the larger asp used as a demonstrative aid had a shocking impact on the jury which prejudiced him. We disagree.
"A ruling on a motion for a mistrial is within the sound discretion of the trial court and should be granted only when it is necessary to ensure that the defendant receives a fair trial." Rivera, 859 So.2d at 512 (internal quotation marks omitted). Although we question the State's approach in using the larger sized asp as a demonstrative aid instead of the original weapon that was available during Ingman's testimony, the fact that the jury saw the larger weapon in this case did not deprive Chamberlain of a fair trial. We reach this conclusion because, notwithstanding the fact that the weapon introduced into evidence was actually smaller than the demonstrative aid, the jury was not misled or confused in any way. See Robinson v. State, 145 So.2d 561, 562 (Fla. 3d DCA 1962) (finding no error in admission of model of murder weapon that did not appear to confuse or mislead the jury). Ingman had previously testified that the asp used as the demonstrative aid was larger than what she had seen Chamberlain holding, and both Thibault and Dascott subsequently identified the smaller weapon as identical to what Chamberlain had possessed. Moreover, the State never made use of the demonstrative aid other than during Ingman's testimony. Thus, in this case, the trial court did not abuse its discretion in denying the motion for mistrial.

Felony Murder Jury Instruction
Chamberlain's specific argument on this issue is unclear. In his brief, Chamberlain quotes portions of the trial transcript in which he argued unsuccessfully that two portions of the felony murder jury instruction should not be given.[9] However, he fails to advance any argument in this Court as to how the instruction was in error. Instead, Chamberlain urges this Court to recede from Knight v. State, 338 So.2d 201, 204 (Fla.1976), and "hold that it is improper, as in the case at bar, for the State to pursue conviction through felony murder when the indictment charges only [premeditated murder]." We conclude that Chamberlain is not entitled to relief on his challenge to the jury instruction or his request that we recede from precedent.
First, because Chamberlain fails to advance any argument to this Court regarding the jury instruction issue he raised at trial, we conclude that he has abandoned that issue. See Shere v. State, 742 So.2d 215, 217 n. 6 (Fla.1999) (finding that issues raised in appellate brief which contain no argument are deemed abandoned). Second, Chamberlain's argument that it is error to pursue conviction through felony murder when the indictment charges only premeditation is not *1104 preserved for appeal. See Spann, 857 So.2d at 852 ("To be preserved for appeal, the specific legal ground upon which a claim is based must be raised at trial and a claim different than that will not be heard on appeal."). Finally, even if the issue were preserved, we are not inclined to recede from this well-established precedent. See Anderson v. State, 841 So.2d 390, 404 (Fla.), cert. denied, ___ U.S. ___, 124 S.Ct. 408, 157 L.Ed.2d 292 (2003); Kearse v. State, 662 So.2d 677, 682 (Fla.1995); Knight, 338 So.2d at 204.

Sufficiency of the Evidence
Chamberlain argues that the trial court erred in denying his motion for judgment of acquittal based on legal insufficiency of the evidence. This issue is wholly without merit.
This Court recently reaffirmed the standard for ruling on a motion for judgment of acquittal. In Darling v. State, 808 So.2d 145, 155 (Fla.), cert denied, 537 U.S. 848, 123 S.Ct. 190, 154 L.Ed.2d 78 (2002), we stated:
In moving for a judgment of acquittal, a defendant "admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence." Lynch v. State, 293 So.2d 44, 45 (Fla.1974). As explained in Lynch:

The courts should not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law. Where there is room for a difference of opinion between reasonable men as to the proof of facts from which the ultimate fact is sought to be established, or where there is room for such differences as to the inference which might be drawn from conceded facts, the Court should submit the case to the jury for their finding, as it is their conclusion, in such cases, that should prevail and not primarily the views of the judge.
Id."The trial court's finding denying a motion for judgment of acquittal will not be reversed on appeal if there is competent substantial evidence to support the jury's verdict." Rogers v. State, 783 So.2d 980, 988 (Fla.2001). Because the jury was instructed on both premeditated and felony murder and found Chamberlain guilty on a general verdict form, the evidence must support either premeditated or felony murder. See Jones v. State, 748 So.2d 1012, 1024 (Fla.1999) (citing Mungin v. State, 689 So.2d 1026, 1029-30 (Fla.1995)).
Here, there is sufficient evidence of both theories of first-degree murder. Three witnesses testified against Chamberlain regarding his involvement in the triple homicide and robbery. Dascott and Thibault both testified that Chamberlain supplied the gun to Thibault. Dascott, Thibault, and Ingman testified that Chamberlain participated in the planning of the robbery. Thibault testified that it was Chamberlain's idea to use the gun and that Chamberlain gave the gun to Thibault only because Thibault was physically larger. Dascott, Thibault, and Ingman all verified that Chamberlain had an asp with him the night of the murders, and Thibault stated that Chamberlain used the asp on Harrison. The medical examiner testified that Harrison had a bruise on his knee consistent with being struck by a blunt object.
Once Ketchum and Harrison were in the bathroom, Chamberlain actively began looting the house and putting items in his car. After Thibault killed Ketchum, testimony from Ingman and Thibault revealed that it was Chamberlain who first encouraged Thibault to kill the other witnesses. Thibault stated that Chamberlain stood beside him while Thibault emptied the gun into Kenyan and Harrison. Chamberlain *1105 then picked up the bullet casings to avoid leaving incriminating evidence. Thibault testified that after Chamberlain and Thibault discovered Harrison was still alive, it was Chamberlain who went to the car, retrieved more bullets, and reloaded the gun. Dascott's testimony supported Thibault's version of the killings.
Thus, in this case there is competent, substantial evidence to support the jury's verdict on either theory of first-degree murder, as well as armed robbery. First, all three murders indisputably occurred in the course of a robbery for which Chamberlain both possessed and supplied a weapon. Therefore, the evidence supports verdicts of guilt of armed robbery and felony murder. Second, regarding premeditated murder, "[p]remeditation is defined as `more than a mere intent to kill; it is a fully formed conscious purpose to kill.'" Green v. State, 715 So.2d 940, 943 (Fla.1998) (quoting Coolen v. State, 696 So.2d 738, 741 (Fla.1997)). This purpose to kill must exist for a sufficient time before the homicide "to permit reflection as to the nature of the act to be committed and the probable result of that act." Id. at 944, (quoting Coolen, 696 So.2d at 741). At a minimum, ample evidence supports the jury's verdict of guilt of the premeditated murders of Harrison and Kenyan.[10] The testimony of Ingman, Thibault, and Dascott established that Chamberlain encouraged Thibault to eliminate the witnesses, stood beside Thibault while he executed the witnesses, calmly picked up the shell casings, and finally went to the car to retrieve more bullets after it was discovered that Harrison was not dead. Although Chamberlain did not actually pull the trigger, the evidence supports the conclusion that he played an integral part in the executions of Harrison and Kenyan, and is guilty as a principal. See Ferrell v. State, 686 So.2d 1324, 1329 (Fla.1996) ("While [the defendant] may not have actually pulled the trigger, the evidence establishes that he played a[n] integral part in these crimes and in actually luring the victim to his death. Thus, at a minimum, he is guilty as a principal under the statute."); Hall v. State, 403 So.2d 1319, 1320 (Fla.1981) (evidence, including fact that defendant and his companion planned robbery of victim together and were together at site of victim's assault and death, supported conclusion that, even if defendant did not pull trigger, he was a principal to crime of murder).[11] Therefore, the trial court properly denied the motion for judgment of acquittal. There is sufficient evidence of the first-degree murder of all three victims and Chamberlain is not entitled to relief on this issue.

PENALTY PHASE

Course of a Felony Aggravator
Chamberlain argues that the murder in the course of a felony aggravator in section *1106 921.141(5)(d), Florida Statutes, violates the Florida and United States Constitutions because it neither performs a narrowing function nor reasonably justifies the imposition of a more severe sentence. This Court has repeatedly rejected this claim. See, e.g., Owen v. State, 862 So.2d 687, 704 (Fla.2003), petition for cert. filed, No. 03-9345 (U.S. Mar. 3, 2004); Johnson v. Moore, 837 So.2d 343, 348 (Fla.2002); Blanco v. State, 706 So.2d 7, 11 (Fla.1997). Further, as noted below, the course of a felony aggravator is merged with, and subsumed within, the pecuniary gain aggravator.

Sufficient Evidence of Aggravation and Mitigation
In this issue, Chamberlain attacks the trial court's findings on aggravation and mitigation. Regarding the aggravators, Chamberlain generally alleges that "the evidence submitted in the instant case did not support any of the aggravating factors found by the trial court." However, he specifically challenges only the finding of CCP.
Although not raised by Chamberlain, we first address the improper doubling of aggravators. We note that the trial court found that Chamberlain committed the murder both (1) for pecuniary gain, and (2) during the course of a felony (robbery). Generally, when a homicide occurs during the course of a robbery, it is improper for the trial court to find as aggravation both that the homicide was committed during the course of a robbery and that the homicide was committed for pecuniary gain. See Barnhill, 834 So.2d at 836, 851; Provence v. State, 337 So.2d 783, 786 (Fla.1976). Therefore, we conclude that the trial court erred in finding both commission for pecuniary gain and commission during the course of a robbery as aggravating factors. Accordingly, we merge these aggravators.
We next address CCP. "[T]he trial judge's ruling on an aggravating circumstance will be sustained on review as long as the court applied the right rule of law and its ruling is supported by competent, substantial evidence in the record." Barnhill, 834 So.2d at 850-51. For the trial court to find CCP, four factors must be established by the evidence:
[T]he jury must first determine that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); and that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); and that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification.
Id. at 851 (quoting Jackson v. State, 648 So.2d 85, 89 (Fla.1994)).
It is clear that Chamberlain's claim that the evidence does not support the trial court's finding of the CCP aggravator for the murders of Harrison and Kenyan is without merit. The trial court stated in its sentencing order:
The final two homicides are remarkable because they are methodical. They are performed in a systematic way. The decision to take life is clearly present in the minds of all three (Thibault, Chamberlain, and Ingman) at the time of the killings.
... What is revealed here is a calculated plan to eliminate that begins with debate, consumes appreciable time and is conducted with the two men (Thibault and Chamberlain) acting in concert. It is concrete and heightened, and it all takes place during a continuing robbery that is a virtual marathon of taking.
....

*1107 Chamberlain provides transportation and the gun. He initiates the idea of witness elimination, and it is he who directs, prods and encourages Thibault in the final executions.
These findings are supported by competent, substantial evidence. Regarding the applicability of the criteria for CCP to these facts, we also conclude that the execution-style nature of the killings is particularly compelling in this case. These wholly unnecessary, execution-style murders are prime examples of the "deliberate ruthlessness" for which application of the CCP aggravating factor is reserved. See Zack v. State, 753 So.2d 9, 21 (Fla.2000); see also McCoy v. State, 853 So.2d 396, 408 (Fla.2003) (affirming CCP where evidence established that there were no signs of physical struggle at the crime scene, the appellant had ample opportunity to leave after completing the robbery, and he unnecessarily executed a compliant hostage execution style); Looney v. State, 803 So.2d 656, 678 (Fla.2001) (applying CCP where "the defendants had ample opportunity to reflect upon their actions, following which they mutually decided to shoot the victims execution-style"), cert. denied, 536 U.S. 966, 122 S.Ct. 2678, 153 L.Ed.2d 850 (2002); Alston v. State, 723 So.2d 148, 162 (Fla.1998) (sustaining the CCP aggravator where the "appellant had ample opportunity to release [the victim] after the robbery," but chose to kill him); Eutzy v. State, 458 So.2d 755, 757 (Fla.1984) (sustaining CCP where there was no sign of struggle, and the victim was shot execution-style).
However, we agree with Chamberlain that the evidence is insufficient to support the trial court's finding that the murder of Ketchum was cold, calculated, and premeditated. There is no evidence that before they placed Ketchum and Harrison in the bathroom, Thibault and Chamberlain formulated a calculated plan to murder the victims. Moreover, it is undisputed that Ketchum's death occurred during a struggle in the bathroom after Ketchum rushed Thibault. Although Thibault may have formulated an intent to kill Ketchum during the attack, the totality of the circumstances indicate an absence of the heightened premeditation by Chamberlain necessary for application of this aggravator. However, as four other valid aggravators exist in this case  (1) previously convicted of a felony and on probation; (2) previous violent felony conviction (the contemporaneous murder convictions); (3) murder committed while engaged in a robbery/pecuniary gain (merged); and (4) murder committed to avoid arrest  any error is harmless beyond a reasonable doubt. This Court has determined that errors in finding aggravators were harmless in analogous cases. See, e.g., Sireci v. Moore, 825 So.2d 882, 887 (Fla.2002) (even assuming that insufficient evidence existed to support the trial court's finding of CCP, any error was harmless because four other valid aggravators existed); Zack v. State, 753 So.2d 9, 20 (Fla.2000) (finding wrongful application of the avoiding a lawful arrest aggravator harmless error where four other valid aggravators  prior violent felonies, pecuniary gain, HAC, and CCP  existed); Guzman v. State, 721 So.2d 1155, 1162 (Fla.1998) (upholding imposition of the death penalty where the CCP aggravator was overturned but the remaining four other aggravators  prior violent felony, committed in the course of a robbery, HAC, and avoiding arrest  existed).
Finally, we address the trial court's findings regarding mitigation. As mitigation Chamberlain presented the testimony of six witnesses, including two mental health counselors. The trial court stated in its sentencing order:

*1108 There are some factors in the defendant's background that are mitigating in nature. There was some abuse by his cousins and the testimony is that they introduced him to criminal conduct. On the other hand he sought their company. He wanted to be with them and did not appear to have other friends. At some point their relationship became brotherly and currently it is described as loving and affectionate. This is mitigation of some weight which I rank as slight.
And he was neglected by his parents....
The parental neglect in this case, while serious, is not as devastating as many within my experience.
Dr. Eugene Herman testified that Mr. Chamberlain's full scale IQ was in the high average range....
[His employers] reported that he was a good employee, a good kid, always respectful; never showed any signs of behavioral problems.... He had started to turn his life around. He obtained his GED and enrolled in the community college.
The turbulence and trauma in his life took place for a few years starting when he was 8 years old.
Our independent review of the record leads us to conclude that these findings on mitigation are supported by competent, substantial evidence.

Proportionality
This Court has an independent obligation to perform a proportionality review of all death sentences. To this end, we have stated:
Due to the uniqueness and finality of death, this Court addresses the propriety of all death sentences in a proportionality review. This review is a unique and highly serious function of this Court, the purpose of which is to foster uniformity in death-penalty law. It is not a comparison between the number of aggravating and mitigating circumstances; rather, it is a thoughtful, deliberate proportionality review to consider the totality of the circumstances in a case, and to compare it with other capital cases.
McCoy, 853 So.2d at 408 (quotation marks and citations omitted). We conclude that the death sentence is proportionate in this case.
We have previously affirmed death sentences where the defendant is a principal in a felony or premeditated murder. See Stephens v. State, 787 So.2d 747, 760 (Fla.2001) (finding death sentence proportionate in case where defendant did not actually commit murder, but personally committed crimes of burglary and robbery and actions displayed reckless disregard for human life); Van Poyck v. State, 564 So.2d 1066, 1070-71 (Fla.1990) (finding the death sentence proportionate where the defendant was the instigator and primary participant in the underlying crimes, came to the scene "armed to the teeth," and knew lethal force could be used).[12] Moreover, *1109 CCP and prior violent felony conviction are considered among the more serious aggravating circumstances. See Anderson v. State, 863 So.2d 169, 188 (Fla.2003), cert. denied, ___ U.S. ___, 124 S.Ct. 1662, 158 L.Ed.2d 363 (2004). Finally, we have affirmed death sentences under circumstances similar to those in this case. See Philmore v. State, 820 So.2d 919, 940 (Fla.) (affirming death sentence where trial court found five aggravating circumstances including prior violent felony, CCP, and pecuniary gain, no statutory mitigators, and eight nonstatutory mitigating circumstances), cert. denied, 537 U.S. 895, 123 S.Ct. 179, 154 L.Ed.2d 162 (2002); Franqui v. State, 804 So.2d 1185, 1198 (Fla.2001) (affirming death sentence where defendant murdered a law enforcement officer during a bank robbery and trial court found three aggravators  pecuniary gain, prior violent felony, and avoid arrest  and minor nonstatutory mitigation); Farina v. State, 801 So.2d 44, 56 (Fla.2001) (holding death penalty was proportionate where defendant was a major participant in an armed robbery, had cold, calculated, and premeditated plan to eliminate any witnesses, but did not have a significant prior criminal history), cert. denied, 536 U.S. 910, 122 S.Ct. 2369, 153 L.Ed.2d 189 (2002).

CONCLUSION
Based on the foregoing, we affirm Chamberlain's convictions and sentences of death.
It is so ordered.
ANSTEAD, C.J., and WELLS, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
LEWIS, J., concurs as to the conviction, and concurs in result only as to the sentence.
NOTES
[1] We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.
[2] The medical examiner, Jacquelin Martin, testified that Harrison had a bruise on his knee consistent with being struck by a blunt object.
[3] The asp was described at trial as an extendable police baton.
[4] The trial judge rejected the following mitigating circumstances: (1) that Chamberlain was an accomplice in a capital felony committed by another person; (2) that he acted under extreme duress or substantial domination; (3) that he had no significant criminal history; (4) that his ability to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired; and (5) the age of the defendant.
[5] Chamberlain does not allege error in the trial court granting the challenges for cause. Rather, as noted above, Chamberlain's argument on this issue is the trial judge's decision to allow any questioning on the death penalty.
[6] If the State has affirmatively waived the death penalty, potential jurors may be told that death is not an option. See, e.g., Sirianni v. State, 411 So.2d 198, 200 (Fla. 5th DCA 1981). Like the limited death qualification in this case, instructing jurors that death is not an option prevents the impaneling of jurors whose views on the death penalty would improperly influence their verdicts as to guilt. In all other first-degree murder cases, death remains a potential penalty. See § 775.082(1), Fla. Stat. (2003) (capital felony is punishable by death or by life imprisonment); § 782.04(1)(a) (first-degree murder constitutes capital felony). Under rule 3.390(a), jurors in such cases are instructed that death may be imposed.
[7] Specifically, Detective Fraser stated that he did not "go along with it" and did not "believe that his  ", referring to the crying.
[8] The hearsay on hearsay objection presumably stemmed from the fact that, before recalling Thibault, the State initially tried to introduce the tape through Detective Fraser.
[9] The standard felony murder jury instruction reads in pertinent part:

To prove the crime of First Degree Felony Murder, the State must prove the following three elements beyond a reasonable doubt:
1. (Victim) is dead.
2. a. [The death occurred as a consequence of and while (defendant) was engaged in the commission of (crime alleged).]
b. [The death occurred as a consequence of and while (defendant) was attempting to commit (crime alleged).]
c. [The death occurred as a consequence of and while (defendant), or an accomplice, was escaping from the immediate scene of (crime alleged).]
3. a. [(Defendant) was the person who actually killed (victim).]
b. [(Victim) was killed by a person other than (defendant); but both (defendant) and the person who killed (victim) were principals in the commission of (crime alleged).]
Fla. Std. Jury Instr. (Crim) 7.3.
[10] Chamberlain does not specifically question whether the evidence supports premeditated murder regarding Ketchum. The State argues that Chamberlain is guilty as a principal. However, prior to Ketchum's murder, which occurred when Ketchum rushed Thibault in the bathroom, it does not appear that there was a preconceived plan to murder the occupants of the house. Nonetheless any error is harmless beyond a reasonable doubt, as there was sufficient evidence to convict Chamberlain of the first-degree felony murder of all three victims.
[11] Section 777.011, Florida Statutes (2003), provides:

Whoever commits any criminal offense against the state, whether felony or misdemeanor, or aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree and may be charged, convicted, and punished as such, whether he or she is or is not actually or constructively present at the commission of such offense.
[12] Although Chamberlain does not specifically raise the issue that the trial court failed to make a factual determination concerning his participation in the murders as prescribed by the United States Supreme Court's decisions in Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), and Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), our independent obligation to perform a proportionality review compels us to address this issue in this case. In Enmund and Tison, the United States Supreme Court held that a sentence of death must be proportional to the defendant's culpability. Thus, in Enmund the Supreme Court indicated that in the felony murder context a sentence of death is not permissible if the defendant only aids and abets a felony during the course of which a murder is committed by another and defendant himself did not kill, attempt to kill, or intend that a killing take place or that lethal force be used. See 458 U.S. at 797, 102 S.Ct. 3368. Later, in Tison the Court said a sentence of death in the felony murder context can be proportional if the defendant is a major participant in the felony and the defendant's state of mind amounts to a reckless indifference to human life. See 481 U.S. at 157, 107 S.Ct. 1676.

In the present case, Chamberlain was not merely an aider or abettor in a felony where a murder was committed by others; Chamberlain personally committed the crime of robbery. He also supplied the gun, instigated the witness elimination, retrieved more bullets and reloaded the gun. This record demonstrates that Chamberlain was not only recklessly indifferent to the taking of human life, but actively pursued and encouraged it. Under these circumstances the death penalty is proportionate. See Stephens, 787 So.2d at 759-60; Van Poyck, 564 So.2d at 1070.