896 So.2d 800 (2005)
Walter DENDY, Appellant,
v.
STATE of Florida, Appellee.
No. 4D03-1914.
District Court of Appeal of Florida, Fourth District.
February 9, 2005.
*801 Fred Haddad of Fred Haddad, P.A., Fort Lauderdale, for appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Sue-Ellen Kenny, Assistant Attorney General, West Palm Beach, for appellee.
PER CURIAM.
This case is a tragedy of escalating animosity between neighbors.
Appellant Walter Dendy and the victim, Leonard "Rudy" Houda managed real estate in Lauderdale-By-The-Sea. Houda ran Souter's Resort, located on the east side of A1A. Dendy managed the Edge-Mar Condominiums, located directly across the street. Two of Souter's units were located within Edge-Mar. For a time, tenants of each property used the amenities of the other. Tenants of Edge-Mar accessed the beach by using a passageway through Souter's.
Following numerous disputes between the two men and instances of vandalism at Souter's, Houda was the victim of a sulfuric acid attack which eventually took his life. A witness saw a man (later identified as Neal Bross) throw acid from an Igloo cooler on Houda, as he was opening his car *802 door in a Publix parking lot. The police spent approximately one year turning up details of the crime. The investigation uncovered a murder-for-hire orchestrated by Dendy.
After a jury trial, Dendy was convicted of second degree murder. The most significant state witness was Emilio Charafardin.
Charafardin testified that he originally met Dendy through a friend. A few times, Dendy hired Charafardin to cut trees or lay bricks around his condominium for $100 or $200 per job. Charafardin stated that Dendy first asked him to dump oil in Souter's pool to get Houda fired. Dendy paid Charafardin in cash and by check.[1] Charafardin also recalled Dendy paying him for pouring acid on a tenant's Corvette. Charafardin admitted dumping oil in Houda's pool a second time and using chemicals purchased by Dendy to damage shrubbery. Charafardin stated that he enlisted Todd Michaud to perform a third oil dumping. Charafardin explained that he did things for Dendy because Dendy told him that he had ties to the Mafia and could help clear Charafardin's name, so that he could use his real name instead of an alias.
Soon after the third oil incident, Dendy requested that Charafardin break Houda's legs. Charafardin said he had to find someone else to do the job. Charafardin testified that the plan then changed to use acid for the attack. He explained that he went with Dendy to the cleaning supply store to purchase sulfuric acid. After the acid was purchased, they stored it in the back of Charafardin's bungalow. Eventually Charafardin recruited co-defendant Neal Bross[2] for the job. Charafardin testified that Dendy planned to pay him $20,000 for finding someone and Bross $200,000 to complete the task.
On the day of the incident, Charafardin and Bross planned to wait in an unoccupied Edge-Mar condominium until Houda left his apartment. While the two men waited, Dendy brought them sandwiches and said he "hope[s] everything goes well."
A few hours later, Houda emerged from his apartment and drove his van to Publix. The men followed in a white pick-up truck. After dropping Bross off, Charafardin drove further away. Charafardin testified that after the attack Bross ran to the car, got in, and the men drove away; Bross stated to Charafardin: "Jobs done." The men later met with Dendy who gave them $400, and said he would get the rest of the money to them at a later time.
On cross-examination, Dendy's counsel discussed Charafardin's various hospitalizations in mental institutions for schizophrenia.[3]
On appeal, Dendy challenges the admission of his statement to the police.
Dendy and the state presented conflicting stories concerning Dendy's requests for an attorney.
A few days after the attack, Sergeant Kenneth Erwin spoke with Dendy in his neighborhood, looking for information about the incident. He did not recall Dendy asking for an attorney.
However, Mark Furth, a city commissioner and hotel owner in the neighborhood, was with Dendy when Erwin approached him. Furth testified that the officers pulled Dendy away to speak to him *803 privately; before being pulled away, Dendy asked if he could have "representation of ... his attorney" or if Furth could be a witness to his interview with the police and "he was denied."
On March 4, 2001, Detectives Thomasevitch and Nicholson arrested Dendy at his home pursuant to a warrant. Thomasevitch read appellant his rights from a standard Broward County Sheriff's Office Miranda[4] rights card. According to the detectives, during Dendy's eight or nine-hour interrogation, he did not ask for an attorney.
A few hours into the interrogation at the station, Thomasevitch confronted Dendy with information that implicated him in the attack. Dendy responded that he would tell the detectives what happened and asked Thomasevitch, "do you think I need an attorney?" Thomasevitch replied: "I cant make that decision for you. You have to make it for yourself." Thomasevitch recalled that Dendy said he would tell them what happened without the presence of an attorney.
Before going on tape, the detectives again read Dendy his rights from the standard form, which he signed. The gist of Dendy's statement was that he hired Charafardin to break Houda's leg; Dendy denied telling him to throw acid on Houda or kill him.
On his side of the case, Dendy testified at the suppression hearing that from the time of his arrest through the interrogation, he requested an attorney ten or twelve times, but was denied.[5] Dendy claimed that immediately after his arrest, while Thomasevitch was reading him his Miranda rights, he twice requested a lawyer.
Before he was taken from his home, Dendy requested that a neighbor tell Dendy's wife to call him a lawyer. Dendy's wife contacted criminal defense attorney Pat Curry. Curry testified that despite several calls to the Broward County Sheriff's Office, he was never connected to Dendy.
Dendy testified in detail about eight requests for a lawyer while he was at the station house, all of which he claimed were ignored.
Denying the motion to suppress the statement, the trial court rejected Dendy's testimony, expressly finding Detective Thomasevitch to be credible.
The warnings given in this case from the standard Broward County Sheriff's Office Miranda rights card were constitutionally deficient. See Franklin v. State, 876 So.2d 607 (Fla. 4th DCA 2004) (noting that Miranda form used by Broward County Sheriff's Office was only one of ninety rights forms obtained from federal and state law enforcement agencies introduced in evidence that failed to indicate that the suspect could consult with a lawyer during questioning), cert. denied, ___ U.S. ___, 125 S.Ct. 890, 160 L.Ed.2d 825 (2005); President v. State, 884 So.2d 126 (Fla. 4th DCA 2004), review denied, 892 So.2d 1014 (Fla.2005); West v. State, 876 So.2d 614 (Fla. 4th DCA 2004), review denied, 892 So.2d 1014 (Fla.2005); Roberts v. State, 874 So.2d 1225 (Fla. 4th DCA 2004), review denied, 892 So.2d 1014 (Fla.2005).[6]
*804 Based on the trial court's finding that Dendy never requested a lawyer, there was no direct evidence that Dendy understood that he had a right to have a lawyer with him during questioning. The state took the position that Dendy never requested a lawyer and the trial court found the states testimony to be credible. Indeed, had the state accepted Dendy's testimony about making ten to twelve requests for a lawyer, then there would have been direct evidence that Dendy fully understood his right to counsel, so that the deficiencies in the Miranda warning would have been of no legal effect. Of course, then there would have been a violation of a different aspect of Miranda because the detectives did not cease questioning Dendy and allow him to consult with a lawyer. See Davis v. United States, 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).
We do not find that the admission of Dendy's statement amounted to harmless error. Harmless error exists where the state establishes beyond a reasonable doubt that the error did not contribute to the verdict. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986). "Application of the test requires an examination of the entire record by the appellate court including a close examination of the permissible evidence on which the jury could have legitimately relied, and in addition an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict." Franklin, 876 So.2d at 609 (quoting DiGuilio, 491 So.2d at 1135).
Dendy's statement corroborated many things contained in Charafardin's testimony. Without it, the state's evidence consisted of a history of bad feelings between neighbors, Dendy's purchase of a large quantity of sulfuric acid, and Charafardin's rendition of the facts. Charafardin's credibility was open to attack, due to his mental problems, criminal record, plea bargain with the state, and tendency to embellish the facts.
As to the other issues raised on appeal, we find only one error. The prosecutor argued in closing that Dendy's request to Sergeant Erwin for a lawyer before his arrest was evidence of his "consciousness of guilt." The state was free to explore the request as a matter of fact, because Dendy had raised it during his direct examination. However, the argument was improper. See Zemina v. Solem, 573 F.2d 1027 (8th Cir.1978) (affirming the grant of habeas corpus relief that the defendant's Sixth Amendment right to counsel was violated when the trial court allowed the prosecutor to suggest in closing argument that the defendant's phone call to his attorney after his arrest indicated his guilt); United States ex rel. Macon v. Yeager, 476 F.2d 613 (3d Cir.1973) (reversing murder conviction because prosecutor claimed in closing argument that defendant's actions immediately after commission of crime, including the hiring of an attorney, were inconsistent with his claim of innocence).
Dendy also challenges the admission of a tape recording Charafardin made after the acid attack. At trial, the defense raised at least the implied charge that Charafardin fabricated a story in return for leniency. The prior statement was therefore admissible as a prior consistent statement under section 90.801(2)(b), Florida Statutes (2002). See Chamberlain v. State, 881 So.2d 1087, 1100 (Fla.2004); Chandler v. State, 702 So.2d 186, 197-98 (Fla.1997).
Reversed and remanded for a new trial.
GROSS and MAY, JJ., concur.
FARMER, C.J., concurs specially with opinion.
*805 FARMER, C.J., concurring specially.
I would also suppress the confession because of the testimony by an entirely neutral witness, a city councilman, that he heard defendant ask for counsel. In denying the motion to suppress, the trial judge did not mention or refer to this testimony. Nevertheless I assume she found it credible but felt it somehow immaterial to whether defendant timely demanded counsel. Any other explanation would suggest that the denial of the motion to suppress is utterly absurd.
I concur in the reversal for a new trial.
NOTES
[1] The state introduced into evidence checks written around June 1999 from the Edge-Mar Condominium Association, of which appellant was the president, to James Cassidy, an alias used by Charafardin.
[2] Tried by a separate jury, Bross was convicted of third degree murder, a lesser included offense of second degree murder.
[3] On direct examination, Charafardin also testified to being arrested six times.
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[5] Part of Dendy's evidence was that three other witnesses in the case-Charafardin, Melinda Burns, and Bruce Novack-all requested attorneys after being taken into custody by the Broward County Sheriff's Office, which ignored all three requests. The state denied that any such requests were made.
[6] As the foregoing citations indicate, both the Florida Supreme Court and United States Supreme Court have declined to review cases ruling on the constitutionality of the Broward County Sheriff's Office's Miranda rights card.