LAGOA, J.
 

 After this Court reversed and remanded for a new trial in
 
 Fleitas v. State,
 
 867 So.2d 512 (Fla. 3d DCA 2004), the defendant, Carlos Fleitas (“Fleitas”), was tried and convicted for a second time on multiple counts of false imprisonment, lewd and lascivious molestation on a child, lewd and lascivious assault on a child, lewd and lascivious acts involving a child, and battery on a child with bodily fluids. Fleitas appeals from the judgment of conviction and sentence for these counts.
 
 [1]
 
 For the reasons set forth below, we affirm.
 

 From 1997 to 2001, Fleitas lived with his girlfriend, Maria V., and her children, including the victim, A.V. Soon after Fleitas moved into their house in Homestead, Florida, A.V. and her siblings began to view Fleitas as a father figure. Their biological father, Luis V., had left their home but continued to live in Homestead. A.V. testified that, initially, she and her siblings liked Fleitas and approved of his relationship with their mother.
 

 The first improper incident occurred when A.V. was ten years old. One afternoon, while A.V.’s mother was at work, Fleitas took A.V. and her sisters to a nearby lake. During a game of “tag,” Fleitas carried A.V. toward a deep part of the lake. According to A.V., Fleitas then asked her “if I had ever seen a man’s penis” and “started explaining to me things that a man’s penis does and different things that happen to a man’s penis and explaining to me the same way how milk would come out of women’s breast it would come out of a man’s penis and stuff.” A.V. testified that at the time she did not know much regarding the topic, having never discussed the matter with her parents or at school. She informed Fleitas that she felt uncomfortable and wanted to go home. Upon returning home, Fleitas called her into his room, locked the door, and moved the television in front of the door. He then removed his towel and exposed himself to her. Next, he went to his closet and retrieved a box containing pornographic magazines. Flei-tas told her to sit on his bed and flip
 
 *353
 
 though one of the magazines while he masturbated. Fleitas then grabbed her hand and forced her to hold his penis. A.V. testified that after ejaculating on her legs, he tried to make her taste the ejaculate. She resisted by closing her mouth tightly. Fleitas then threatened to cut off her mother’s hands, kill the rest of her family, and burn down the house if A.V. mentioned the incident to anyone.
 

 The following day, while her mother was at work, Fleitas again summoned A.V. into his room, locked the door, and barricaded the door with the television. He then removed his pants, inserted the movie “White Men Can’t Jump” into the VCR, and ordered A.V. to fast forward the movie to a sex scene. He told A.V. to rewind and replay the scene several times while he masturbated. A.V. testified that, again, Fleitas ejaculated onto her legs. According to A.V., Fleitas said that he wanted to “go inside of me” and “teach me how it is to be a woman.” Fleitas also told her that he wanted to photograph her topless, having sex with his son. A.V. testified that after those initial incidents, no more similar episodes occurred until after the family moved to Hialeah, Florida.
 

 A.V. testified that the first night in the new house, after everyone had retired for the night, Fleitas went into the bedroom that she shared with her younger sister. He began to massage her legs and feet and placed his hand over her underwear while he masturbated and ejaculated. A.V. testified that during the following two years, Fleitas made frequent visits to her bedroom in the early mornings. At one point, Fleitas removed a bar from the edge of the bed to gain better access to her legs and feet. A.V. testified that her sister never awoke during any of the incidents.
 

 A.V. testified that Fleitas also exposed himself to her at other times, such as when she passed through his room to take out the garbage. In 2000, she began stacking boxes in front of her bedroom door and sleeping in multiple layers of jeans, sweaters, and bras, hoping to avoid contact with Fleitas. AV.’s mother testified to being concerned about AV.’s strange behavior, but she did not pursue the matter. A.V. testified that the incidents with Fleitas occurred routinely through January 2001.
 

 During that time, A.V. and other members of her family witnessed several violent fights between Fleitas and AV.’s mother. One such incident occurred when AV.’s mother was pregnant with Fleitas’s son. A.V. testified that she was unable to sleep many nights and her grades suffered. During cross-examination, she admitted that at the time she had a boyfriend. Fleitas did not approve of the boyfriend and restricted his access to the house. A.V. testified that one night she resisted Fleitas’s advances and threatened to tell her mother what had happened during the previous three years. When Fleitas reiterated his threats to kill the family, A.V. responded that she did not care if she died and that Fleitas convinced her to remain silent.
 

 In 2001, AV.’s mother expelled Fleitas from their house. During a relative’s birthday party, Fleitas and AV.'s mother began to argue when Fleitas tried to discipline one of AV.’s sisters. The argument escalated, and one of AV.’s sisters unsuccessfully tried to call 911. Fleitas destroyed the phone before the police were contacted. AV.’s mother then left the party with her children and drove to their house to secure the rent money before Fleitas returned. Fleitas moved out of their house that night. During the following three months, Fleitas made almost daily visits to the home. A.V. testified that in March, 2001, when she felt confident that her mother would not allow Fleitas to re
 
 *354
 
 turn, she finally told her mother about the alleged abuse.
 

 A.V.’s mother immediately confronted Fleitas and accused him of raping A.V. AV.’s mother testified that Fleitas denied the rape accusations, stating that he merely touched A.V., and begged A.V.’s mother not to call the police. A.V. testified that she also asked her mother not to involve the police. A few days later, however, A.V.’s mother contacted the police. A.V. went to the Hialeah Police Department and gave a sworn statement to Detective Diaz. She also met with an Assistant State Attorney and provided another sworn statement. Fleitas was arrested on charges of and relating to child sexual molestation.
 

 A.V. testified that in the days that followed she received daily calls from Flei-tas’s relatives asking her to recant her accusations. A.V. was also aware that her mother suffered financial difficulties and was unable to pay the utility bills on time. A.V. testified that she finally succumbed to the pressure and signed an affidavit recanting her story: “I thought that would have been great for everything just to be able to go away and for us just to be safe at home. I was willing to sign anything that was like that.”
 

 Protocol at Florida’s Department of Children and Families (“DCF”) requires DCF investigators to question children in recantation cases. A.V. reaffirmed her re-eantation to two DCF workers, Donald Machacón and Carolyn Cornelius. A.V. also denied the charges to her father, who subsequently told AV.’s mother that if A.V. did not withdraw the recantation the State would place their children in foster care. AV.’s mother then signed a statement stating that the State Attorney’s Office threatened to take away her children if she did not cooperate with the prosecutor. At trial, AV.’s mother admitted that the State Attorney’s Office never made such threats and that she signed the false statement “because Luis [A.V.’s father] told me and I never knew it could be not true.”
 

 In May 2001, the trial court appointed attorney Richard Hersh as AV.’s guardian ad litem. Hersh encouraged A.V. and AV.’s mother to enter counseling at Kristi House, a nonprofit child sexual abuse support center endorsed by DCF. A.V. testified that the therapy sessions at Kristi House helped her gain the strength to confront the situation. She later told her father that the denials of the charges were false. Shortly thereafter, she formally withdrew her recantation and the case proceeded to trial.
 

 On appeal, Fleitas contends that a new trial is warranted based on the trial testimony of Detective Diaz, which Fleitas argues impermissibly bolstered AV.’s testimony.
 
 [2]
 
 The State argues that the testi
 
 *355
 
 mony Fleitas claims constitutes improper bolstering was either unobjected to or solely challenged by a general objection, and therefore was not properly preserved for appellate review. We agree.
 

 It is well settled in Florida that to be preserved for appeal, “the specific legal ground upon which a claim is based must be raised at trial and a claim different than that will not be heard on appeal.”
 
 Rodriguez v. State,
 
 609 So.2d 493, 499 (Fla.1992).
 
 See also Chamberlain v. State,
 
 881 So.2d 1087, 1100 (Fla.2004);
 
 Spann v. State,
 
 857 So.2d 845, 852 (Fla.2003). Indeed, proper preservation requires the following three steps from a party: (1) a timely, contemporaneous objection; (2) a legal ground for the objection and; (3) “[i]n order for an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or motion below.”
 
 Harrell v. State,
 
 894 So.2d 935, 940 (Fla.2005) (quoting
 
 Steinhorst v. State,
 
 412 So.2d 332, 338 (Fla.1982)). The purpose of this rule is to place the trial court on notice that an error may have been committed and therefore provide the trial court with an opportunity to rectify the error prior to any potential appellate review.
 
 [3]
 

 
 *356
 
 At trial, Fleitas failed to make a timely, contemporaneous objection when the State questioned Detective Diaz regarding A.V.’s prior statements to the police. Additionally, although Fleitas did object to the Detective’s testimony regarding A.V.’s prior consistent statements to the State Attorney’s Office, Fleitas failed to state the specific legal ground for the objection that he now raises on appeal,
 
 i.e.,
 
 improper bolstering. We, therefore, find that Flei-tas did not properly preserve this issue for appellate review.
 
 See Chamberlain,
 
 881 So.2d 1087 (finding that issue was not preserved even though defendant objected on general ground of hearsay, because defendant did not specifically object at trial that the tape was inadmissible as a prior consistent statement). We further note that Detective Diaz never testified as to the content or substance of the prior consistent statement, and we, therefore, question whether the testimony even implicates the doctrine of improper bolstering.
 

 However, even if the issue had been preserved, we find Fleitas’s argument without merit.
 
 [4]
 
 While prior consistent statements are generally inadmissible when used to bolster a witness’s credibility,
 
 see, e.g., Taylor v. State, 855
 
 So.2d 1, 22 (Fla.2003);
 
 Bradley v. State,
 
 787 So.2d 732, 743 (Fla.2001);
 
 Van Gallon v. State,
 
 50 So.2d 882 (Fla.1951), such statements are admissible if they fall within a hearsay exception or are introduced to rehabilitate a witness or “to rebut an express or implied charge against the witness of improper influence, motive or recent fabrication.”
 
 Gardner v. State,
 
 480 So.2d 91, 93 (Fla.1985).
 
 See e.g., Griffith v. State,
 
 762 So.2d 1022, 1023 (Fla. 3d DCA 2000) (“The prior consistent statement was necessary to rehabilitate [the witness] after his impeachment by the defense and was a recognized exception to the hearsay rule.”);
 
 Monday v. State,
 
 792 So.2d 1278, 1281 (Fla. 1st DCA 2001) (a prior consistent statement used to rehabilitate a witness who has been impeached may be admissible even in situations where the witness does not claim an exception to the hearsay rule). Because the record establishes that A.V.’s prior statements were introduced to rehabilitate A.V. from Fleitas’s implied argument of “improper influence, motive or recent fabrication,” we find that they were admissible.
 

 Pursuant to section 90.801(2)(b), Florida Statutes (2007), a prior consistent statement is not hearsay if (1) “the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement” and (2) “the statement is consistent with the declarant’s testimony and is offered to rebut an express or implied charge against the declarant of improper influence, motive,
 
 or
 
 recent fabrication.” (emphasis added).
 
 [5]
 
 Here, the State
 
 *357
 
 met the first element of section 90.801(2)(b) because A.V., the declarant, testified at trial and was subject to cross-examination.
 
 See Harris v. State,
 
 843 So.2d 856, 862 (Fla.2003) (although the witness’s prior consistent statement was introduced via testimony of a friend, the witness testified at trial and was subject to cross-examination).
 
 [6]
 

 As to the second element, the prior consistent statements must have been made
 
 “before
 
 the existence of a fact said to indicate bias, interest, corruption, or other motive to falsify the prior consistent statement.”
 
 Taylor,
 
 855 So.2d at 23 (emphasis added). Fleitas argues that this second element has not been met. Specifically, in his reply brief, Fleitas argues for the first time that his defense was not one of recent fabrication or improper influence, but rather that A.V. lied from the onset when she made the allegation against Fleitas. The record, however, refutes this argument.
 

 Indeed, Fleitas’s main theory at trial focused on A.V.’s recantations and, in essence, that her multiple inconsistent stories made her testimony not credible. After her initial report, A.V. signed an affidavit explicitly recanting that initial report.
 
 [7]
 
 Subsequent to signing the affida
 
 *358
 
 vit, A.V. withdrew the affidavit as a lie and testified at trial as to the veracity of the initial report. During eross-examination, Fleitas’s counsel specifically questioned A.V. regarding the three, separate recantations she made during the course of the investigation.
 
 [8]
 
 A review of the rec
 
 *359
 
 ord establishes that throughout the trial, the defense attempted to persuade the jury that A.V.’s reaffirmation of the initial report was a result of improper influence and/or a recent fabrication.
 
 [9]
 
 The record establishes that defense counsel at trial both directly and indirectly implied that A.V. changed her recantation as a result of improper influence from the State, her mother, her father, and DCF.
 
 [10]
 
 We,
 
 *360
 
 therefore, find that A.V.’s prior statement to Detective Diaz predated the alleged improper influence and/or recent fabrication, and were introduced to rebut Flei-tas’s contention that A.V.’s testimony was not worthy of belief.
 

 These attempts to impeach A.V. show that Fleitas was suggesting, either expressly or impliedly, that A.V. had recently changed or fabricated her testimony.
 
 See Griffith,
 
 762 So.2d at 1023 (trial court did not abuse its discretion when it admitted a prior consistent statement that served to rehabilitate the witness after defense impeached him with prior inconsistent statements from a pretrial deposition, thereby suggesting that that he had changed or fabricated his testimony). Moreover, by repeatedly suggesting to the jury that A.Y. withdrew her recantations due to pressure from the State Attorney’s Office to pursue the charges, Fleitas implied that A.V. had a recent motive to lie.
 
 See Smith v. State,
 
 538 So.2d 66, 68 (Fla. 1st DCA 1989) (“We find on the record an implied charge by Smith that the victim was improperly influenced by her mother and the state to bring charges against her father, and that this influence created in her a motive to lie.”). We, therefore, conclude that the prior consistent statements were offered to rebut the charges of recent fabrication, improper influence and/or improper motive and, accordingly, were admissible.
 

 We decline to address the remaining issues raised on appeal as we conclude that
 
 *361
 
 they are without merit and/or are harmless beyond a reasonable doubt.
 
 See State v. DiGuilio,
 
 491 So.2d 1129, 1135 (Fla.1986).
 

 Accordingly, we affirm the final judgment of convictions and sentences.
 

 Affirmed.
 

 [1]
 

 . A judgment of acquittal was granted on counts
 
 4,
 
 7, 12 and 14, which involved battery with bodily fluids.
 

 [2]
 

 . Specifically, Fleitas objects to the following testimony elicited during Detective Diaz's direct examination:
 

 Q: And in your opinion and experience would you say that she gave you a detailed description of what occurred?
 

 A: A very detailed description.
 

 Q: A very detailed description and again you interviewed over a thousand witnesses, correct?
 

 A: Yes, unfortunately.
 

 Q: Let me ask you this: What's the significance of a victim in this type of case giving you a detailed account as opposed to a general account?
 

 A: Well, basically unfortunately something in the case, that’s something she experienced, actually witnessed. You are talking about twelve, thirteen year old telling you such a graphic details. It's hard to believe that she just made up her mind to put these things—
 

 DEFENSE COUNSEL: Objection, Your Honor.
 

 THE COURT: Sustained.
 

 
 *355
 
 Q: Detective, there is [sic] two types of cases you deal with. There is [sic] sexual batteries and there is [sic] lewd and lascivious.
 

 A: Correct.
 

 Q: Could you say in your opinion that details are more important in this type of case that we are dealing with than a sexual battery case, for example?
 

 A: Absolutely sex battery cases you got penetration, you got evidence that the Rape Treatment can testify. They can testify for assisting the victim. Molestation cases you got the rubbing and touching and which is not a lasting evidence. You need to rely more on the details that this young victim gives you.
 

 Q: Now, the statement that she gave you during the preinterview compared to the statement that she gave you during the formal interview would you say that these statements were consistent?
 

 DEFENSE COUNSEL: Objection.
 

 THE COURT: Sustained.
 

 Q: Were the statements she gave you consistent?
 

 DEFENSE COUNSEL: Objection.
 

 A: Yes.
 

 THE COURT: Sustain the objection. Next question.
 

 Q: Was
 
 "A"
 
 able to identify the person who sexually abused her?
 

 DEFENSE COUNSEL: Objection.
 

 THE COURT: Overruled.
 

 A: Yes.
 

 Q: Who did she identify that person to be?
 

 A: She identified as gentleman named Charlie, which is the boyfriend of her mom.
 

 Q: Prior to meeting "A” do you have any personal knowledge of her meeting with another officer?
 

 A: Night before uniform officers were dispatched to her home, yes.
 

 Q: And in comparing what she told that officer and what she told you, were her statements consistent?
 

 A: Yes, they were.
 

 Q: Okay. After speaking to ''A,” did you have an opportunity to speak to her mom, [M.V.]?
 

 A: Yes.
 

 Q: And soon after meeting with them and obtaining all the information that you needed, was there eventually an arrest of the defendant in this case?
 

 A: Yes.
 

 Q: After the defendant was arrested did you learn that
 
 “A"
 
 met with the State Attorney's Office and provided a sworn statement also and a pre-file conference?
 

 DEFENSE COUNSEL: Objection.
 

 THE COURT: Overruled.
 

 A: Yes.
 

 Q: You have any personnel [sic] knowledge of that meeting being consistent with conversations you had had with her?
 

 DEFENSE COUNSEL: Objection.
 

 THE COURT: Overruled.
 

 A: Yes, the file. The charges were filed.
 

 [3]
 

 . The sole exception to the contemporaneous objection rule is fundamental error. Unpre-served issues may constitute grounds for reversal under the fundamental error doctrine.
 
 *356
 

 See
 
 § 924.051(3), Fla. Stat. (2007). The fundamental error doctrine, however, is applied only rarely.
 
 Harrell,
 
 894 So.2d at 941. An error need not be preserved if it "reaches to the foundation of the case and is equal to a denial of due process.”
 
 Williams v. State,
 
 892 So.2d 1185, 1187 (Fla. 5th DCA 2005).
 
 See also F.B. v. State,
 
 852 So.2d 226, 229 (Fla.2003);
 
 State v. Johnson,
 
 616 So.2d 1, 3 (Fla.1993). Indeed, ”[t]o be fundamental, an error must 'reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.' ”
 
 Harrell,
 
 894 So.2d at 941 (quoting
 
 Brown v. State,
 
 124 So.2d 481, 484 (Fla.1960)). Based on our review of the record, we cannot find that the testimony of Detective Diaz demands application of the fundamental error doctrine.
 

 [4]
 

 . The admissibility of evidence by a trial court will not be disturbed on appeal absent an abuse of discretion.
 
 Johnston v. State,
 
 863 So.2d 271, 278 (Fla.2003).
 

 [5]
 

 . We note that the State under section 90.801(2)(b) is not required to show both improper influence
 
 and
 
 recent fabrication. Sec
 
 *357
 
 tion 90.801(2)(b) provides for the admissibility of a prior consistent statement upon a showing of either circumstance.
 

 [6]
 

 . In his reply brief, Fleitas contends that "neither the contents of [A.V.'s] prior statements nor their consistency were the subject of direct examination.” We find this contention without merit. A review of the record shows that A.V.'s prior statements as well as the facts that led her to make those statements were the subject of lengthy examination. Moreover, during A.V.'s direct examination the following exchange occurred regarding her prior statements to Detective Diaz:
 

 Q: Did the City of Hialeah Police Department respond to the house?
 

 A: Yes.
 

 Q: Did you end up speaking with a woman police officer in the back of the house initially?
 

 A: Yes.
 

 Q: The following day did you go down to the Hialeah Police Department and speak with a detective who had been assigned to the case?
 

 A: Yes.
 

 Q: Was that Detective Ray Diaz?
 

 A: Yes.
 

 Q: And did you spend time recounting for him what we had just been talking about the last couple of hours to him?
 

 A: Yes.
 

 Q: Once you reviewed everything with him one time though [sic], did there come a time when he had you raise your right hand and take a sworn statement from you?
 

 A: Yes.
 

 Q: In the sworn statement you told him again everything that had been going on?
 

 A: Yes.
 

 Q: After that did your mom bring you down to the State Attorney's Office to meet with an assistant state attorney to get the case filed?
 

 A: Yes.
 

 Q: During that meeting — during that meeting did you raise your right hand and give sworn testimony to that prosecutor to get the case filed?
 

 A: Yes.
 

 Q: Did you recount for her as you did for Detective Diaz what had been going on for the last three years?
 

 A: Yes.
 

 [7]
 

 . On direct examination, A.V. testified as to the contents of the affidavit and whether anyone pressured her to withdraw the affidavit. Specifically, A.V. testified as follows:
 

 Q: [G]o ahead and read it aloud.
 

 A: It says I am alleged victim. I have not been pressured or coerced to sign this statement. I have not had sexual contact of any kind with Carlos Fleitas, the defendant at any time. I was upset with Carlos and made false accusation against him. I am telling the truth in this statement. I do not wish to speak to the police or state attorney regarding this case because they have the right to arrest if I say I did not have sex with Carlos. Sworn and subscribed before me this day of—
 

 Q: Did the police or State Attorney’s Office threaten you that they were going to arrest you if you did not cooperate?
 

 
 *358
 
 A: No.
 

 Q: Did the State Attorney's Office ever threaten they were going to arrest your mother or father, anybody if there was no cooperation in this case?
 

 A: No.
 

 Q: Is what's contained in that affidavit the truth or a lie?
 

 A: A lie.
 

 Q: Was that lie said because you just wanted this nightmare to be over with?
 

 A: Yes.
 

 [8]
 

 . Specifically, the following exchange occurred during A.V.’s cross-examination:
 

 Q. Now, on one occasion yesterday you testified about an affidavit that you signed onto; is that correct?
 

 A. Yes.
 

 Q: And at that time you signed an affidavit that stated that nothing had happened with Mr. Fleitas and that you had made it up; is that correct?
 

 A: Yes.
 

 Q: There aren't any fancy words in this document, right?
 

 A: No.
 

 Q: You knew all the words in this document? You know the vocabulary; is that correct?
 

 A: Well, now I do. I guess at the time there was couple but—
 

 Q: Hard words in here?
 

 A: Well, I didn't know what affidavit meant and stuff.
 

 Q: But you knew you were signing a paper?
 

 A: Yes.
 

 Q: And you knew that you were signing a paper because you stated in this paper that what you were saying about him were lies?
 

 A: I was signing a paper that was going to make everything go away.
 

 Q: Now, subsequent to this affidavit did you have an opportunity to meet with HRS or DCF Investigators?
 

 A: Yes.
 

 Q: Do you know what a DCF Investigator is?
 

 A: Yes.
 

 Q: What is it?
 

 A: The people who investigate the cases for HRS.
 

 Q: And did those HRS Investigators talking first about Miss Cornelius, do you remember Miss Cornelius?
 

 A: Yes
 

 Q: She works with kids all day long?
 

 A; Right.
 

 Q; And she let you know that?
 

 A: Yes.
 

 Q; After she let you know, I work with kids all day long, what did you say?
 

 A: I told her that wasn’t true....
 

 Q: What was not true?
 

 A: What I had said that had happened.
 

 Q: With Carlos?
 

 A: Right.
 

 Q: When did you meet Richard Hersh?
 

 A: Later on in that time period.
 

 Q; Did you meet Mr. Machacón, Donald Machacón before you met Mr. Hersh?
 

 A: I don’t remember what order it came.
 

 Q: And he went to your school?
 

 A; Yes.
 

 Q: And at that school did you tell him anything about the allegations that you made about Mr. Fleitas?
 

 A: Yes.
 

 Q: What did you tell Donald Machacón at the school?
 

 A: That they weren't true.
 

 Q: Did you tell him why you had said it?
 

 A: Yes.
 

 Q: Why did you say the lie in the first place?
 

 A: I don't remember why it was. I think I said because he didn't treat my mom right.
 

 Q: Okay. And you didn't want him coming home anymore, right?
 

 A: I don’t remember.
 

 Q: You were afraid he would come home?
 

 A: I don’t remember, but I think it was that he didn’t treat my mom right.
 

 Q: Now, when you said this to Donald Machacón were you in fear of being hurt?
 

 A: No.
 

 Q: There was no reason to be in fear; is that right?
 

 
 *359
 
 A: Right. But everything else that was going on is what lead [sic] to my decision to saying what I did.
 

 Q: And everything that was going on began after you spoke with Mr. Hersh; is that correct?
 

 A: No.
 

 Q: Mr. Hersh came to your house?
 

 A: Yes.
 

 Q: And Mr. Hersh warned your mother in front of you that if you retracted she could loose [sic] the children, didn't he say that?
 

 A: No. Everything that was going on in my house had nothing to do with any of the lawyers or anything to do with anything like that. Electricity and emotions and feelings and everything that was going on had nothing to do with the legalness of the case or anything.
 

 Q: When you were talking to Donald Ma-chacón was anybody else present?
 

 A: I don't remember.
 

 Q: Was there a school counselor?
 

 A: I don't remember.
 

 Q: Was it in the school counselor’s office?
 

 A: Yes.
 

 Q: Your mom was not there?
 

 A: I don't remember. I don’t think so.
 

 Q: Your father was not there?
 

 A: No.
 

 Q: Anyone from Mr. Fleitas’ family was there?
 

 A: No.
 

 Q; It was just you, Mr. Machacón, and probably a counselor, you don't remember that part?
 

 A: Right.
 

 Q: Now, when you denied it one time with Miss Cornelius, the first time that you denied it you were in your house; isn’t that correct?
 

 A: Yes.
 

 [9]
 

 . In opening, defense counsel stated as follows:
 

 The evidence will show that once [A.V.'s mother] has met with the various counselors, the prosecutor's office, and Mr. Hersh she comes to the realization that if she doesn’t continue this prosecution, even if it is a charade she will loose [sic] all her children. Now, little "A” is now faced with a problem that her mother will lose all of her children if she maintains that what she has alleged against Mr. Fleitas is a lie. She maintained that it was a lie when she provided an affidavit at an attorney’s office. She maintained that it was a lie at least twice to HRS workers. One is Mrs. Cornelius and the other one is Mr. Machacón. Mr. Machacón interviewed her at the school away from the mother, away from the father, and in the presence of the guidance counselor only and at that point the child stated what I said was a lie. I only wanted to make sure he wouldn’t come back home because I didn’t want him there.
 

 In closing argument, defense counsel again implied that A.V. was influenced by the State and her mother to withdraw her recantations:
 

 During Maria [V.'s] testimony we began to sense the pressure that is being placed. The allegations by the Fleitas family and submit to you it's by the State Attorney's Office. Let's compare the kind of pressure we are dealing with here. Visits by an elderly lady, visits by family providing rides. Helping get a lawyer. Those are the assistance being offered by the Fleitas family. What is Maria [V.] seeing on the other end. Threats of her children being taken away. Threats that are made surreptitiously through her former husband. A guardian ad litem is appointed on the case and he shows up at her house and as he states I make sure and with no uncertain terms I wanted to make sure that she knew she had to take this child to counseling. Where was the counseling. At the Kristi Office. Where is the Kristi Office according to [A.V.], it's the same place where their office is. Is this independent counseling? Is this private counseling?
 

 [10]
 

 . Specifically, during closing, the defense argued the following to the jury:
 

 Carlos is not coming back home. She doesn't want him coming back and she admitted that. She admitted that not to someone that the Fleitas family went out and hired, not to Mr. Marcus, not to any
 
 *360
 
 body else. She went out and she admitted that to DCF workers. State of Florida employees whose only interest is to protect children. They go out and interview. She gives them consistent statements recanting that she has made up these allegations against Carlos. That inconsistency in the testimony is enough for you to come back with a not guilty verdict as to all three charges. You say well the prosecution has rehabilitated her. The prosecution has made her come back and be a witness here in the case. Let’s analyze how it was that the prosecution got her to come back and be a witness in the case. She came back and became a witness in the case when her father contacted her at school and took her outside and hugged her and kissed her for the first time like in five years according to him. At that point Miss A.V. changes her testimony. Right or wrong. Wrong. That is what the prosecution offered happened through Mr. Luis [V.]. That never happened. Mr. [V.] testifies and during cross examination read the dates. Oh, yeah, maybe eleven is on the affidavit that "A” signed.... He says, oh yeah, May 11th is crossed out and it says May 17th. May 17th is the day before he speaks to a state attorney. Now, let's see how this gentleman spoke with the state attorney and how we learned that he spoke with a state attorney. He got a call he said.... He doesn't want to admit that it’s the prosecutor that's calling him. I had to go back and bait him through a series of questions, including giving him a multiple choice question who called you "A” the state attorney, "B” Department of Children and Families or "C” the police. After thinking it over for a while and not wanting to give and [sic] answer .... [h]e goes over and he looks at their bench and he said the state attorney and he put his head down.
 

 In this case this child has given inconsistent statements with the testimony, provided in court. Each inconsistent statement is grounds for you to find reasonable doubt and to come back with a verdict of not guilty is your duty.
 

 The testimony that she gave which was inconsistent is that now she alleges that this gentleman did certain things with her, which were inappropriate and previous to that she gave inconsistent statements to one, the person that provided the affidavit, to the persons that work for DCF.
 

 When you have a recantation, when you have that type of inconsistent testimony and inconsistent statement that is an obligation upon you as jurors to determine whether that is a reasonable doubt and if that does create a reasonable doubt, you must come back with a not guilty verdict. You must come back with a not guilty verdict on each count. She recanted on each and every allegation read to her.