EMAS, J.
John Merrone was arrested and charged with false imprisonment, sexual battery and aggravated battery. Following a jury trial, he was found guilty of false imprisonment and two counts of simple battery, and sentences were imposed. Merrone appeals his convictions and sentences. The issue is whether the court erred in denying a defense request to call a witness to rebut an express or implied charge of improper influence, motive or recent fabrication by another defense witness. For the reasons that follow, we hold that the *591 trial court committed reversible error, and reverse and remand for a new trial.
Merrone was a merchant marine/charter boat captain in the Florida Keys and a frequent customer of Hog Fish Bar and Grill on Stock Island (“Hog Fish”). On the evening of March 3, 2011, Merrone was drinking at Hog Fish and engaged in casual conversation with one of the bar waitresses, Melissa Aiello. Aiello had finished her shift and was having some beers and shots of liquor. Aiello testified at trial that she explained to Merrone that she was looking for an apartment close to Hog Fish, and Merrone indicated he had a room available for rent in his apartment next door. The two left Hog Fish and went to Merrone’s apartment.
Once inside Merrone’s apartment, Aiello testified she told Merrone she was not interested in renting the room, and wanted to leave, but Merrone prevented her from leaving by blocking her passage. At some point thereafter, Aiello found herself on Merrone’s bed with all her clothes off and Merrone on top of her. Aiello said that Merrone then forcibly raped her with his arms against her neck, despite her saying she did not want to do this. Aiello said she told Merrone she was going to be sick and he allowed her to go to the bathroom, where she forced herself to vomit, but he blocked her exit from the bathroom. Upon her return to the bedroom, Aiello said Merrone sexually assaulted her, and prevented her from reaching her cell phone to call for help by grabbing her toe and breaking it. After breaking her toe, Aiello said, Merrone raped her again. She eventually fought him off and ran out of the apartment with her belongings, but without her cell phone.
Aiello ran to her trailer, changed clothes, and then ran a mile further to the home of Tyler Veach, a man with whom she was acquainted. She told Veach that she had been raped, but insisted he not call the police. Aiello spent the night at Veach’s, and the next day (March 4) went back to work at Hog Fish.
Aiello said she told a couple of people at work what happened to her, and then called her sister, who lived out of state. Aiello continued to state that she did not want to report the rape to police. Notwithstanding this, Aiello’s sister called the police, and a deputy came to Hog Fish to speak with Aiello about the incident. Aiel-lo told the officer she was “okay” and did not want to file a report.
On Saturday morning, March 5, Mer-rone went to Hog Fish and returned Aiel-lo’s cell phone to Lee Cerda, another Hog Fish employee. Aiello came into work later that day, and told Cerda everything that had happened. That same day, Cerda relayed the story to her fiancé, Val Winter, and Winter, an assistant state attorney, called 911 to report the incident. Winter and Cerda then drove Aiello to the Lower Keys Medical Center emergency room and reported she had been sexually assaulted. Beverly Huckabay, the registered nurse on duty, filled out examination forms, wherein she documented her observation of bruises on Aiello’s arm, swelling and bruising to a middle toe, abrasions, red eyes and some redness on her neck.
Detective Manny Cuervo of the Monroe County Sheriff’s Office was assigned to investigate the case. He first met with Aiello at the emergency room on March 5. Detective Cuervo testified that he observed Aiello was shaky, had bruises on her arms, and redness in her eyes. Detective Cuervo later interviewed Aiello at his office.
The next day (March 6), Detective Cuer-vo interviewed Merrone, at which time Merrone admitted having sexual intercourse with Aiello on the night in question, *592 but told Detective Cuervo that it was consensual. Merrone told Detective Cuervo that he and Aiello never talked about renting a room in his apartment, but instead left the bar for the sole purpose of having sex. Detective Cuervo noticed bruises on Merrone’s chest and arm. He arrested Merrone, and then spoke to Merrone’s roommate and business associate, Frank Silver.
While Merrone was in jail awaiting trial, Silver ran Merrone’s charter boat business. However, Silver was not paid in full during this time. At some point prior to trial, Silver demanded Merrone pay him for his work in running the business. Silver even threatened to sue Merrone if Merrone did not pay him. Approximately two weeks before trial, Merrone paid Silver $2,100 for his services in operating the charter business while Merrone was in custody awaiting trial.
In opening statement, the prosecutor told the jury that Frank Silver would testify he was in the apartment on the night of the rape and heard nothing unusual. The prosecutor cautioned the jurors, however, that they would have to consider Silver’s bias or motive for his testimony on behalf of Merrone:
It’s also anticipated that the defense will call the defendant’s roommate, a Frank Silver, who alleges that he was at the apartment that night, the night that this occurred. And Mr. Silver, it is believed, will allege that he heard people come in and he heard — what he heard that night was nothing that alarmed him. That he heard noises, but didn’t see anything, because he was in his room.... [B]ut what bias or motives does the witness, Mr. Silver, have? And I ask you to keep that in mind when he testifies. And I ask that you keep that in mind when Mr. Silver, the defendant’s employee, who you will learn demanded that he get paid $2000 for money he believed he was owed before he would come and testify. Think about that when you’re listening to the testimony of Mr. Silver.
Aiello testified at trial that the sex was not consensual and that Merrone prevented her from leaving his apartment. However, this issue was hotly contested by Merrone, and both the State and defense presented expert witnesses whose testimony regarding Aiello’s injuries supported their respective versions of the incident.
Nurse Huckabay testified as to the details of her examination of Aiello when she came to the ER nearly forty-eight hours after the incident. Huckabay testified that Aiello had bruises on her arm, redness on her neck, abrasions and swelling and bruising on one of her toes. Huckabay and the doctor treated Aiello for her injuries, including taking an x-ray of her toe, which was broken.[1] Huckabay also testified that when she asked Aiello the cause of her injuries, Aiello said she was at a bar and someone named Captain John[2] told her he had an apartment for rent. When she went to look at the apartment, Aiello told Huckabay, she was sexually assaulted by Captain John, and tried to fight him off.[3]
*593 Tyson Veach testified that when Aiello came to his home on the night in question, she appeared sweaty, panicking, scared and crying. Over defense objection[4], Veach testified that Aiello told him she had been raped by someone named John and that she eventually escaped by fighting him off.
During the defense case, Frank Silver testified that he was in the apartment the night of the alleged rape; that he heard two people having sex; and that the woman sounded happy. Silver said he would have come out of his room if he thought anyone was being hurt. Silver also testified about the money he was owed by Merrone for the work he did running the charter business while Merrone was in custody, and acknowledged that he was finally paid the money he was owed two weeks before trial. Silver insisted that the payment did not affect his willingness to testify, and that he had already accepted the subpoena before he was paid.
On cross-examination, the prosecutor questioned Silver about his demand to be paid the money he was owed, and Silver admitted he had threatened to sue Mer-rone if he wasn’t paid. However, he testified that he left town on May 6,[5] assuming he would not be paid and never told anyone that he would not testify unless he was paid. Silver testified on redirect that he told the police on the night of Merrone’s arrest he was present during the incident and it sounded like Merrone and the woman with him were having a good time.
Following Silver’s testimony, defense counsel asked to recall Detective Cuervo to the stand to testify to what Silver told him on the night of Merrone’s arrest. The State objected on hearsay grounds. The defense argued the State’s cross examination of Silver suggested improper influence and recent fabrication by Silver, and asked to recall Detective Cuervo in order to establish that Silver’s prior statement to the police was consistent with his trial testimony, was made just a few days after the incident, and was made before Silver was owed any money by Merrone (and therefore before the existence of any improper influence or motive to fabricate). The State objected and the trial court sustained the objection, finding there was never any assertion that Silver suddenly made up the story because he was paid money by Merrone.
Although the trial court permitted the defense to recall Detective Cuervo to testify about other matters, the trial court did not permit the defense to elicit the substance of Silver’s prior consistent statement to Detective Cuervo on the night of Merrone’s arrest.
During closing argument, the prosecutor reminded the jury that Silver “remarkably” had been paid $2,100 by Merrone two weeks before trial.
The jury found Merrone guilty of false imprisonment as charged, but on the counts of sexual battery and aggravated battery, found him guilty of the lesser-included offenses of simple battery. The defense moved for a new trial and a re *594 newed motion for judgment of acquittal, both of which were denied. Merrone was sentenced to two years’ prison for false imprisonment, followed by three years’ probation, and two consecutive one-year terms of probation for the two battery counts.
Merrone appealed, contending, inter alia, that the trial court erred in not permitting the defense to recall Detective Cuervo to testify that Silver gave a prior statement a few days after the incident, consistent with the substance of his trial testimony.
We review for an abuse of discretion the trial court’s decision not to allow Detective Cuervo to testify about Silver’s prior consistent statement. Kelley v. State, 486 So.2d 578 (Fla.1986). “Prior consistent statements are generally inadmissible to corroborate or bolster a witness’s trial testimony, because such statements are usually hearsay.” Peterson v. State, 874 So.2d 14, 16 (Fla. 4th DCA 2004). However, section 90.801(2)(b), Florida Statutes (2011) provides:
(2) A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross examination concerning the statement and the statement is:
[[Image here]]
(b) Consistent with the declarant’s testimony and is offered to rebut an express or implied charge against the declarant of improper influence, motive, or recent fabrication.
To qualify for admission under this provision, a “prior consistent statement admitted to rebut a charge of bias, corruption or improper motive must have been made ‘prior to the existence of a fact said to indicate bias, interest, corruption or other motive to falsify.’ ” Jenkins v. State, 547 So.2d 1017, 1020 (Fla. 1st DCA 1989) (quoting McElveen v. State, 415 So.2d 746, 748 (Fla. 1st DCA 1982)).
Although the court allowed the defense to recall Detective Cuervo to testify about statements made by Aiello during a police interview, it did not permit testimony about Silver’s prior consistent statement because it found “there was never an implication that Silver suddenly made up the story because he was paid.”
Merrone argues that Detective Cuervo should have been allowed to testify to what Silver told him on the night of Merrone’s arrest because the State suggested, in opening and in cross-examination (and later in closing), that Silver’s testimony was motivated by the fact that, just two weeks before trial, he was paid $2100 owed by Merrone. As earlier discussed, the prosecutor stated in opening that when listening to Silver’s anticipated testimony the jury should consider
what bias or motives does the witness, Mr. Silver, have? And I ask you to keep that in mind when he testifies. And I ask that you keep that in mind when Mr. Silver, the defendant’s employee, who you will learn demanded that he get paid $2000 for money he believed he was owed before he would come and testify. Think about that when you’re listening to the testimony of Mr. Silver.
Silver testified exactly as the prosecutor had predicted — that he was in the apartment the night of the alleged rape, that he heard Merrone having sex with a woman, and that the woman sounded like she was having a good time. Silver also testified that, following Merrone’s arrest (and after Silver had already given his statement to Detective Cuervo) he helped run the charter business while Merrone was in custody. Silver testified about the money he was owed by Merrone for his work, and ac *595 knowledged that he was finally paid the $2100 two weeks before trial.
On cross-examination, the State questioned Silver regarding inconsistencies between his prior statement to Detective Cuervo and his trial testimony; the fact that he was owed $2100 by Merrone for his work running the business; that he had threatened to sue Merrone if he was not paid; and that he allegedly refused to accept service of his witness subpoena unless he was first paid the $2100 he was owed.
On redirect, Silver testified that, on the night of Merrone’s arrest, he gave a statement to Detective Cuervo, telling him the same thing he told the jury. However, the defense was denied the opportunity to call Detective Cuervo to elicit the content of the statement Silver had given the detective within two days of the incident.
In its rebuttal closing, the State again argued:
And, yes, you have the ear witness, this ear witness, Frank Silver, who did not see anything. He didn’t see anything. He’s owed money. He testified there were absolutely no assurances made by the defendant’s father in April that he was going to get paid. He had a conversation about being paid the monies owed, but he was given no assurances. He did not believe he was going to get paid. But two weeks before the trial remarkably he receives his $2,100 that he is owed.
We hold that the trial court abused its discretion in not permitting the defense to elicit from Detective Cuervo what Silver had told the detective on the day of Mer-rone’s arrest, to establish that this prior statement was consistent with Silver’s testimony at trial, and was made before Silver was ever owed (or paid) any money by Merrone. Once the State suggested or implied Silver’s testimony at trial was improperly influenced, was improperly motivated, or was recently fabricated, the defense should have been permitted to show, through the testimony of Detective Cuer-vo, that Silver had provided an earlier consistent statement and that this prior consistent statement was made “prior to the existence of a fact said to indicate bias, interest, corruption or other motive to falsify.” Jenkins, 547 So.2d at 1020. We cannot know whether the jury harbored any doubt about whether Silver was telling the truth or simply providing testimony favorable to Merrone because he had been paid money just before trial. However, it is certainly reasonable to conclude that the testimony from Detective Cuervo would have aided substantially in eliminating any such doubt, and the failure to permit the testimony under these circumstances was an abuse of discretion. See Tumblin v. State, 29 So.3d 1093 (Fla.2010); Fleitas v. State, 3 So.3d 351 (Fla. 3d DCA 2008); Briscoe v. Celebrity Cruises, Inc., 894 So.2d 294 (Fla. 3d DCA 2005).
The State argues that there was never any claim or suggestion that Silver’s testimony was fabricated, only that his willingness to testify at trial was motivated by the fact that he was paid $2100 by Mer-rone just before trial. We find this hairsplitting argument unpersuasive. If the State concedes that the substance of Silver’s testimony was true (i.e. that he was in fact in the next room during the incident, heard what went on inside, and believed from what he heard that Merrone and Aiello were having a good time), then the fact that Merrone paid Silver $2100 two weeks before trial is irrelevant, and the State would have had no reason to make such an argument during trial. It seems quite apparent (and the jury surely could reasonably have understood) that the State was questioning not simply Silver’s motive for coming to court to testify, but *596 the substance and veracity of his testimony as well.[6] This conclusion is further supported by the cross-examination of Silver, in which the State questioned Silver not only about the money owed (and his refusal to testify unless paid), but also about a number of claimed inconsistencies between his trial testimony and his prior statement to Detective Cuervo. There was an implied, if not express, charge of improper influence or recent fabrication, making relevant and probative the proffered testimony of Detective Cuervo, who would have confirmed that Silver gave an account, just a few days after the incident which was consistent with the substance of Silver’s testimony at trial.
The State also argues that any error was harmless. We cannot agree. We reject the State’s contention that the error was harmless because Silver testified that he had given police a prior statement consistent with his trial testimony. This is hardly the evidentiary equivalent of Detective Cuervo himself verifying this and testifying to the content of the prior statement made by Silver. Given that Detective Cuervo testified (twice) during trial and was not asked (on either occasion) about the existence and substance of Silver’s prior statement, the jury might well have doubted whether Silver was telling the truth when he said he gave a statement to Detective Cuervo on the night of Merrone’s arrest that was consistent with his testimony at trial.
Further, this case involved a sexual encounter which the victim testified was committed against her will, and which the defendant contended was consensual. Both sides presented expert witnesses on this central issue, who offered competing opinions on the nature and cause of Aiello’s condition and injuries. Silver was Mer-rone’s roommate and, as the prosecutor indicated in his closing, the only “ear witness” to the events that night. Silver’s credibility, as the only other witness present during the incident, was critical. The State suggested through its opening statement, its cross-examination, and its closing argument, that Silver’s presence at trial, as well as the substance of his testimony, was motivated by his demands for (and eve-of-trial receipt of) a $2100 payment by Merrone for services rendered. The defense was entitled to show that Silver provided the same version of events to the police before he ever rendered these services to, or was owed money by, Merrone. If this prior consistent statement (and Detective Cuervo’s testimony confirming it) had been presented to the jury, it could well have mitigated, or eliminated altogether, the State’s suggestion that Silver was improperly influenced or motivated and that his testimony was not to be believed.[7]
*597 Reversed and remanded for a new trial.[8],[9]

.The defense called a former medical examiner as an expert witness to rebut the State witness’ testimony regarding the nature and cause of Aiello's injuries. The defense expert opined that the broken toe was consistent with someone stubbing their toe on an object, rather than the toe being pulled.

. At trial, evidence was presented that Mer-rone is known as "Captain John.”

. Defense counsel objected when the prosecutor asked Huckabay what Aiello had told her was the cause of her injuries and the trial court overruled the objection, stating "Well, I believe this falls within the exception of the *593 hearsay [rule], so I’m going to overrule the objection." No further discussion was had, and Huckabay went on to testify as to what Aiello had told her during the exam.

. The trial court ruled that Aiello’s statements to Veach were excited utterances because her testimony and Veach's testimony established that her state and condition were part of a continuous sequence of events from the time of the incident until she arrived at Veach’s home and told Veach what had happened at Merrone’s apartment.

. Silver, who was from North Carolina, decided to move back home when it became clear that there was not enough money coming in to keep Merrone’s business running.

. In fact, during the discussion with the court over whether the defense would be permitted to recall Detective Cuervo to elicit this prior consistent statement, the defense stated that if the State were willing to stipulate (and the jury instructed) that Silver had in fact made the prior statement to Cuervo on the night of Merrone's arrest, the defense would not seek to recall Detective Cuervo for that purpose. However, the State refused to stipulate.

. The State insists the jury must have given Silver’s testimony credence because it found Merrone not guilty of sexual assault and aggravated battery, and instead found him guilty of the lesser charges of simple battery. We do not know why the jury returned the verdicts in this case. What we do know is that the State has failed to establish beyond a reasonable doubt that this error did not contribute to those verdicts. See Knowles v. State, 848 So.2d 1055, 1059 (Fla.2003) (reaffirming that "[i]f the appellate court cannot say beyond a reasonable doubt that the error did not affect the verdict, then the error is by definition harmful.”) (quoting State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986)).

. At a new trial, the State can proceed against Merrone on the original charge of false imprisonment. However, the State may not proceed on the original charges of sexual battery or aggravated battery, but only on the two lesser-included offenses of battery for which he was found guilty. Price v. Georgia, 398 U.S. 323, 327, 90 S.Ct. 1757, 26 L.Ed.2d 300 (1970) (holding that conviction of a lesser-included offense constitutes an acquittal of the greater offense, and double jeopardy principles bar a prosecution on the greater offense upon retrial). See also Bowden v. State, 152 Fla. 715, 12 So.2d 887 (1943), opinion after remand, 154 Fla. 511, 18 So.2d 478 (1944); Jackson v. State, 449 So.2d 411 (Fla. 2d DCA 1984).

. Although not necessary to our decision, because this case is remanded for a new trial we add the following: Merrone raises another evidentiary claim-the erroneous admission of testimony by Nurse Huckabay (approximately two days after the incident) regarding what Aiello told her. The trial court ruled that her testimony was admissible as an exception to the hearsay rule, but failed to specify the precise exception and failed to consider the different aspects of this testimony. Statements made for purposes of medical diagnosis or treatment are admissible as an exception to the hearsay rule, see section 90.803(4), Florida Statutes (2011) (providing for the admissibility of "[sjtatements made for purposes of medical diagnosis or treatment by a person seeking the diagnosis or treatment ... which statements describe medical history, past or present symptoms, pain, or sensations, or the inceptions or general character of the cause or external source thereof, insofar as reasonably pertinent to diagnosis or treatment"), but the exception generally does not extend, for example, to a declarant’s statement identifying the person committing the acts causing the injury (unless such identification is shown to be relevant to the medical diagnosis or treatment). See Torres-Arboledo v. State, 524 So.2d 403 (Fla.1988); State v. Frazier, 753 So.2d 644 (Fla. 5th DCA 2000).